[No. D018819. Fourth Dist., Div. One. Sept. 5, 1995.]

ASPEN ENTERPRISES, INC., Plaintiff and Appellant, v.
GERALD BODGE et al., Defendants and Appellants.

## COUNSEL

Luce, Forward, Hamilton & Scripps, Scott W. Sonne and Roger C. Haerr for Plaintiff and Appellant.

Pain, Cluff, Olson & Burns, Pain, Cluff & Burns and Jerry D. Cluff for Defendants and Appellants.

## OPINION

**HUFFMAN, J.**—Plaintiff Aspen Enterprises, Inc. (Aspen) sued defendants Gerald and Karen Bodge (collectively Bodge) on a promissory note secured by both real property and personal property. At the outset of the action Aspen repossessed personal property collateral consisting of an inventory of new tires. At trial, the court granted Bodge's motion for nonsuit based on what was stipulated to be Aspen's opening statement, concluding Aspen was barred under the California Uniform Commercial Code from seeking a deficiency judgment.

Aspen appeals the grant of nonsuit, contending: (1) its cause of action for judicial foreclosure was not an action for a deficiency judgment because California Uniform Commercial Code[1] section 9501 authorizes a creditor whose security is mixed real and personal property to proceed in any sequence against the collateral without triggering an antideficiency bar; (2) it was not required to give notice of sale of the repossessed collateral under section 9504 because there is a recognized market for the collateral; (3) it

---

[1] All statutory references are to the California Uniform Commercial Code unless otherwise specified.

was not required to give notice of sale of the repossessed collateral because, at the time of the initial hearing on the motion for nonsuit, the collateral had not been sold, but merely repossessed; (4) it gave notice of sale of the collateral before the court's final decision on the motion for nonsuit, and whether it acted in a commercially reasonable manner by waiting until then to notice the sale is a question of fact for the jury; and (5) the court erred in ruling it elected to retain the inventory in satisfaction of the judgment.

Bodge cross-appeals, contending the trial court abused its discretion in denying Bodge's posttrial motion for attorney fees under Civil Code section 1717.

For the reasons explained below, we agree with Aspen that the court erred in granting nonsuit.

### FACTUAL AND PROCEDURAL BACKGROUND

The following facts are set forth in Aspen's opening statement, on which the court granted nonsuit.

Aspen, a tire wholesaler, took a promissory note from Bodge in a transaction whereby Bodge purchased a retail tire outlet from Aspen. The note was secured in part by the tire store's inventory, which Aspen had sold to Bodge at wholesale prices. The note was additionally secured by residential real property owned by Bodge.

After Bodge defaulted on the note, Aspen filed an action for breach of the note, obtained an ex parte writ of possession and temporary restraining order prohibiting Bodge from selling or concealing the tire inventory, and repossessed a quantity of the tires. Subsequently, Aspen amended its complaint to include a cause of action for judicial foreclosure against the real property security.

Aspen inventoried the repossessed tires and generated computer invoices giving Bodge credit for the tires at the same published wholesale prices Bodge originally paid for them. Aspen's attorney sent the invoices to Bodge's attorney and issued a credit to Bodge in the amount of $7,432.23, the wholesale market value of the tires. Although Aspen kept the repossessed tires segregated in its warehouse pending resolution of Bodge's challenges to its writ of possession, the tires were eventually returned to and commingled with Aspen's inventory.

The court treated its resolution of this case as a grant of nonsuit on Aspen's opening statement, although a jury was never impaneled. Bodge

moved for nonsuit on the first day of trial, contending for the first time that Aspen's action for judicial foreclosure against the real property collateral was an action for a deficiency judgment which was barred either by Aspen's failure to conduct a sale or failure to give notice of sale of the repossessed tires as required by section 9504. To save time and the inconvenience of impaneling a jury, the parties stipulated that Aspen's oral argument against the motion for nonsuit and supplemental opposition brief to be filed later would constitute its opening statement.

The court granted Bodge's motion for nonsuit, ruling that Aspen's "retention of collateral after its . . . non-judicial repossession without either publication of sale or conduct of actual sale of the collateral so repossessed barred the instant action which was for a deficiency judgment."

DISCUSSION

I

*Standard of Review*

In reviewing a grant of nonsuit, the appellate court must evaluate the evidence in the light most favorable to the plaintiff. All presumptions, inferences and doubts must be resolved in plaintiff's favor and against the defendant. Only if the evidence, viewed in this light, requires judgment for defendant as a matter of law should a judgment of nonsuit be affirmed. (*Nally* v. *Grace Community Church* (1988) 47 Cal.3d 278, 291 [253 Cal.Rptr. 97, 763 P.2d 948].)

In ruling on a motion for nonsuit based on plaintiff's opening statement, the trial court must assume the plaintiff will be able to prove all favorable facts alleged. (*Loral Corp.* v. *Moyes* (1985) 174 Cal.App.3d 268, 272 [219 Cal.Rptr. 836].) In the present case, the parties stipulated that Aspen's oral argument and supplemental brief in opposition to the motion for nonsuit would serve as its opening statement. We must therefore assume Aspen could prove the facts asserted in its opposition brief.

II

*Are the Provisions of the California Uniform Commercial Code Inapplicable to Aspen's Proceedings against Its Personal Property Collateral because Aspen's Lawsuit Is a Unified Foreclosure Action Under Section 9501, Subdivision (4)(a)(ii)?*

Section 9501, as amended in 1985, is an attempt by the Legislature to clarify the rights of a secured creditor in foreclosing on mixed property

collateral (i.e., realty and personalty).[2] Section 9501, subdivision (4)(a) essentially provides that a secured creditor with mixed collateral may either (1) proceed against the personal property collateral in accordance with the California Uniform Commercial Code and the real property collateral in accordance with real property law (§ 9501, subd. (4)(a)(i)); (2) proceed in any sequence against some or all of real and personal property collateral in accordance with the procedures applicable to real property (§ 9501, subd. (4)(a)(ii)); or (3) follow the first option as to part of the personal property collateral and the second option as to other personal property collateral (§ 9501, subd. (4)(a)(iii)).

 Aspen contends it elected the second option by amending its complaint to include a cause of action for judicial foreclosure of real property, i.e., that its action against Bodge is a "unified foreclosure" action against both its real and personal property collateral. Therefore, Aspen argues, pursuant to subparagraph (ii) of section 9501, subdivision (4)(a), its proceedings against the personal property collateral are governed by real property law and not the California Uniform Commercial Code.[3]

This contention is without merit. Although there are apparently no published cases interpreting the 1985 amendment to section 9501, the overall statutory scheme suggests the "unified foreclosure" option of section 9501, subdivision (4)(a)(ii) was intended to apply only where a debt is secured by collateral which consists of *closely related* elements of real property and personal property, such as business premises plus the fixtures and inventory

---

[2] See Hirsch et al., *The U.C.C. Mixed Collateral Statute—Has Paradise Really Been Lost?* (1988) 36 UCLA L.Rev. 1, 2.

[3] Section 9501, subdivision (4)(a)(ii) provides in relevant part: "(4) If an obligation secured by a security interest in personal property or fixtures . . . is also secured by an interest in real property or an estate therein: [¶] (a) The secured party may . . . [¶] (ii) Proceed in any sequence, as to both some or all of the real property and some or all of the personal property or fixtures in accordance with the secured party's rights and remedies in respect of the real property, by including the portion of the personal property or fixtures selected by the secured party in the judicial or nonjudicial foreclosure of the real property in accordance with the procedures applicable to real property. In proceeding under this subparagraph, (A) no provision of this chapter other than this subparagraph . . . [and other specified provisions of section 9501] shall apply to any aspect of the foreclosure; (B) a power of sale under the deed of trust or mortgage shall be exercisable with respect to both the real property and the personal property or fixtures being sold; and (C) the sale may be conducted by the mortgagee under the mortgage or by the trustee under the deed of trust. The secured party shall not be deemed to have elected irrevocably to proceed as to both real property and personal property or fixtures as provided in this subparagraph with respect to any particular property, unless and until that particular property has been actually disposed of pursuant to a unified sale (judicial or nonjudicial) conducted in accordance with the procedures applicable to real property, and then only as to the property so sold."

of the business located on the premises. The following commentary regarding amended section 9501 is instructive as to the type of situation subdivision (4)(a)(ii) was designed to address: "A hotel is perhaps the paradigm of a type of collateral which is comprised of very closely related elements of realty and personalty. Taken together, the real property, the fixtures and the tangible and intangible types of personal property which comprise a typical hotel property constitute an integrated operating business. When combined as a single functional unit, these mixed collateral elements usually have substantial added value as a going concern. . . . [¶] . . . A unified sale of the intertwined portions of the hotel collateral package . . . might enhance the likelihood of realizing more of the 'going concern' value. Moreover, . . . such a sale should result in the personalty included in a unified judicial foreclosure being counted in any computation of 'fair value' under [Code of Civil Procedure] section 726." (Hirsch et al., *The U.C.C. Mixed Collateral Statute—Has Paradise Really Been Lost?*, *supra*, 36 UCLA L.Rev. 1, 36, fns. omitted.) Aspen's mixed collateral, consisting of tires and residential real property unrelated to the Bodge's tire business, is not the sort of closely-related mixed collateral contemplated by section 9501, subdivision (4)(a)(ii).

Moreover, because a secured creditor's sale of repossessed collateral must be conducted in a commercially reasonable manner (§ 9504, subd. (3); *Crocker Nat. Bank* v. *Emerald* (1990) 221 Cal.App.3d 852, 861 [270 Cal.Rptr. 699]), the unified-sale option of section 9501, subdivision(4)(a)(ii) can be used only where it is commercially reasonable to conduct a unified foreclosure sale of both personal property and real property collateral. As a matter of common sense, it would be commercially unreasonable to conduct a unified sale of the mixed collateral in the present case, as potential buyers of residential real property are not likely to be enticed by the prospect of acquiring a large inventory of tires along with the property. Nor are tire retailers likely to be interested in acquiring residential real property along with their inventory.

That the unified foreclosure option of section 9501, subdivision (4)(a)(ii) necessarily involves an actual unified sale of mixed collateral, as opposed to merely a "unified" complaint encompassing both real and personal property collateral as Aspen suggests, is indicated by the provision in section 9501, subdivision (4)(a)(ii) stating, "The secured party shall not be deemed to have elected irrevocably to proceed as to both real property and personal property . . . unless and until that particular property *has been actually disposed of pursuant to a unified sale* (judicial or nonjudicial) conducted in accordance with the procedures applicable to real property, and then only as to the

property so sold." (Italics added.) Aspen cannot be deemed to have elected the unified sale option of section 9501, subdivision(4)(a)(ii) because it would not be commercially reasonable for Aspen to attempt to sell its personal property collateral by conducting such a unified sale. Therefore, the requirements of the California Uniform Commercial Code regarding disposition of personal property collateral apply to Aspen's disposition of the tires it repossessed from Bodge.

## III

### *Is Aspen Barred From Seeking a Deficiency Judgment Because It Failed to Comply With Section 9504, Subdivision (3)?*

Alternatively to arguing Aspen made an implied election to retain the repossessed tires in satisfaction of the entire debt, Bodge contends Aspen failed to comply with the requirement of section 9504, subdivision (3) that the secured party give advance notice to the debtor of the sale of collateral.[4] The threshold issue here is whether Aspen actually sold or "otherwise dispose[d] of" the tires within the meaning of section 9504, subdivision (1), as opposed to retaining them.[5]

The confusion over this point stems from the fact Aspen commingled the repossessed tires with its general inventory, which presumably resulted in the tires being sold in the ordinary course of Aspen's business. The California Uniform Commercial Code specifically allows fungible collateral to be commingled in this manner. Section 9207, subdivision (2)(d) regarding the duties of a secured creditor in possession of security provides, "The secured party must keep the collateral identifiable but fungible collateral may be commingled." Aspen kept the tires identifiable by inventorying them after they were repossessed, and the tires were fungible goods because each tire could be replaced by an identical tire.

Aspen essentially argues the commingling of the repossessed tires did not constitute a sale because, as fungible collateral which has been properly

---

[4] In relevant part, section 9504, subdivision (3) states: "A sale or lease of collateral may be as a unit or in parcels, at wholesale or retail and at any time and place and on any terms, provided the secured party acts in good faith and in a commercially reasonable manner. Unless collateral is perishable or threatens to decline speedily in value or is of a type customarily sold on a recognized market, the secured party must give to the debtor . . . a notice in writing of the time and place of any public sale or of the time on or after which any private sale or other intended disposition is to be made."

[5] Section 9504, subdivision (1) states in pertinent part: "A secured party after default may sell, lease or otherwise dispose of any or all of the collateral in its then condition or following any commercially reasonable preparation or processing."

identified, the tires could be segregated and sold separately at any time.[6] Aspen correctly argues it should not be barred from pursuing a deficiency judgment for failure to give proper notice of the sale of its collateral if the collateral was not sold, but merely retained.

The confusion over whether the tires were sold or retained is reflected in the contradictory basis for granting nonsuit articulated by the trial court. The court's order after hearing states that "plaintiff's retention of the collateral after its July 3, 1990, non-judicial repossession without either publication of sale or conduct of actual sale of collateral so repossessed barred the instant action which was for a deficiency judgment." The court's statement that the action was barred by Aspen's repossession without "publication of sale" implies the court found the collateral was improperly sold without proper notice to Bodge, as there is no requirement of notice absent a sale. On the other hand, the court stated Aspen's action was barred because Aspen failed to sell the collateral. Implicit in this statement is a finding of an implied election by Aspen to retain the collateral in satisfaction of the debt. The judgment of nonsuit is not properly based on such contradictory findings.[7]

We are unaware of any authority from any jurisdiction addressing the issue whether commingling and sale of fungible collateral as part of the secured party's general inventory constitutes a "sale" or other disposition of collateral of which advance notice must be given to the debtor under section

---

[6] In fact, Aspen gave notice of sale of the repossessed tires *after* Bodge moved for nonsuit.

[7] The court further articulated its contradictory reasoning in open court when granting nonsuit. When Aspen's counsel asked if the court was finding, as a matter of law, that a sale had been conducted under section 9504, the court responded, "No. I am saying [Aspen] did not follow the necessary procedures of notice and notice of sale to allow them to proceed by way of a deficiency judgment." When Aspen's counsel then suggested that the court had to find a sale in order to conclude that notice was required to be given, the court replied, "No, counsel. There [are] ways to proceed. There [are] ways to retain the goods without conducting a sale, or there is conducting a sale. It's my understanding there hasn't been a sale conducted, so there has been no notice of giving a sale. And that by electing to proceed in the retention remedy area, that they have charted a course that prohibits them from obtaining a deficiency judgment."

Aspen's counsel then asked if the court was finding as a matter of law that it was unreasonable for Aspen to have held onto the collateral since it was repossessed without conducting a sale. The court responded, "No. I think I go back to my other statement. Once they take it and retain it and proceed in that course, I don't feel it's necessary for the court to make a ruling as to whether or not that was reasonable. I think they have made a choice of which course they are going to take, whether they are going to go by way of sale or whether they are going to go by way of retention. And the fact that they take retention, they are then prohibiting a deficiency judgment procedure."

Thus, the court apparently concluded that retention of collateral by a secured creditor for some unspecified period of time without conduct of a sale bars a deficiency judgment as a matter of law, regardless whether such retention is commercially reasonable.

9504. Accepting as true the facts presented in Aspen's stipulated opening statement, we conclude Aspen sold or otherwise disposed of the repossessed collateral within the meaning of section 9504, subdivision (1), but did so in a commercially reasonable manner with adequate notice under section 9504, subdivision (3).

The purpose of requiring notice of sale to the debtor is to alert the debtor that his or her interest in the collateral is soon to be extinguished, and to afford the debtor or other bidders located by the debtor the opportunity to be present at the sale. This protects the debtor from self-dealing in the disposition of the collateral or an unfairly low auction price. (*Ford & Vlahos* v. *ITT Commercial Finance Corp.* (1994) 8 Cal.4th 1220, 1232-1233 [36 Cal.Rptr.2d 464, 885 P.2d 877]; *PWS, Inc.* v. *Ban* (1991) 234 Cal.App.3d 223, 229 [285 Cal.Rptr. 598].)

Where properly identified fungible collateral is commingled and sold for market value as part of the creditor's overall inventory and the debtor is credited accordingly and given notice of the credit, as here, there is no danger of self-dealing or that an unfairly low price will be realized for the collateral. If the debtor perceives such danger and wishes to have the collateral segregated from the creditor's other inventory and sold in a separate sale, the debtor can object to the sale of the collateral as general inventory and require a separate sale, provided the debtor's demand for such separate sale is made within a reasonable time after receiving notice of the credit given for the value of the collateral.[8] As long as the creditor has properly identified the fungible collateral as required by section 9207, such a separate sale can be easily arranged, even after the collateral has been commingled with other goods in the creditor's possession. Thus, the notice to the debtor that the fungible collateral has been inventoried or otherwise identified and that the debtor is to be credited with the market value of the identified goods can effectively operate as notice of intended disposition of the collateral under section 9504 in appropriate cases, such as the present case.

Accordingly, we conclude the procedure described in Aspen's stipulated opening statement of commingling its repossessed fungible collateral with general inventory, while giving Bodge credit for the market value of the collateral, was a commercially reasonable and practical manner of disposing

---

[8]A requirement that the debtor assert any objection and demand for a segregated sale within a reasonable time after receiving notice of credit for the value of commingled fungible collateral would preclude the debtor's attempting to take unfair advantage of an increase in the market price of the collateral occurring long after it is repossessed.

of the collateral without jeopardizing Bodge's right to receive fair credit for its value. Such disposition of fungible collateral serves the interests of both the debtor and the secured party. The debtor receives fair credit for the market value of the collateral while the secured party avoids the pointless exercise and expense of segregating and conducting a separate sale of the collateral which can only fetch the same market price that would be obtained by selling the collateral in the ordinary course of business as part of the secured party's general inventory.

We conclude the trial court erred in both aspects of its ambiguous ruling. To the extent the court ruled Aspen is barred from seeking a deficiency judgment because it retained the collateral without conducting a sale, the court erred because, based on Aspen's opening statement, the goods were sold or "otherwise dispose[d] of" within the meaning of section 9504 and not retained. To the extent the court ruled that Aspen sold the collateral without proper notice, the court erred because Aspen's notice to Bodge of the intended disposition of the collateral was adequate to protect Bodge's interest in receiving fair credit for the value of the collateral.

IV

*Is There a "Recognized Market" for New Tires?*

Subdivision (3) of section 9504 provides that notice of sale or disposition of collateral need not be given to the debtor if the collateral is "of a type customarily sold on a recognized market." (§ 9504, subd. (3).)[9] Assuming arguendo Aspen disposed of the repossessed tires without notice to Bodge, the trial court erred in granting nonsuit against Aspen on that ground, because the facts asserted by Aspen support a finding that there is a "recognized market" for new tires.

There is very little California case law discussing the applicability of the recognized market exception to the notice requirement of section 9504. The following is a common statement of the factors generally considered in determining whether there is a recognized market for a particular type of collateral: "A 'recognized market' has been described as one where sales involved many items so similar that individual differences are nonexistent or immaterial, where haggling and competitive bidding are not primary factors in each sale, and where the prices paid in actual sales of comparable property are currently available by quotation." (*1st Charter Lease Co.* v. *McAl, Inc.* (Colo. 1984) 679 P.2d 114, 115; see also *Norton* v.

[9]See *ante*, page 1820, footnote 4.

*National Bank of Commerce of Pine Bluff* (1966) 240 Ark. 143 [398 S.W.2d 538, 540] overruled on another ground in *First State Bank of Morrilton* v. *Hallett* (1987) 291 Ark. 37 [722 S.W.2d 555]; *Nelson* v. *Monarch Invest. Plan of Henderson, Inc.* (Ky. 1970) 452 S.W.2d 375, 377; *State Bank of Towner* v. *Hansen* (N.D. 1981) 302 N.W.2d 760, 765, quoting *Norton*; *Cottam* v. *Heppner* (Utah 1989) 777 P.2d 468, 473.) In *Canadian Commercial Bank* v. *Ascher Findley Co.* (1991) 229 Cal.App.3d 1139 [280 Cal.Rptr. 521], the court alluded to this test for determining the existence of a recognized market, stating the recognized market exemption from the notice requirement of section 9504 "refers to collateral such as stocks and bonds . . . which are widely traded on exchanges such as the New York Stock Exchange or commodities markets and for which daily price quotations are available." (*Canadian Commercial Bank* v. *Ascher Findley Co.*, *supra*, at p. 1159.)

Reviewing the cases nationwide, it is clear that the recognized market exemption definitely applies to stocks and bonds traded on exchanges such as the New York Stock Exchange, and definitely does not apply to used cars. (*Canadian Commercial Bank* v. *Ascher Findley Co.*, *supra*, 229 Cal.App.3d at p. 1159 [concluding there is no recognized market for a used oil drilling rig].) With respect to collateral falling between used cars and stocks on the recognized market spectrum, case law is divided.[10]

For example, courts of Montana and North Dakota have held there is no recognized market for cattle. (*State Bank of Towner* v. *Hansen*, *supra*, 302 N.W.2d at p. 765; *Wippert* v. *Blackfeet Tribe* (1985) 215 Mont. 85 [695 P.2d 461].) The North Dakota court, agreeing with a Texas opinion, stated " 'the term recognized market within the meaning of the U.C.C. is most restrictive.' Only those items of collateral which are commonly sold on a market such as the stock market or the commodity market wherein the price at any given moment is fixed and is free from an individualized competitive bidding process fall within the category of 'recognized market' collateral which is exempt from the notice requirement . . . ." (*State Bank of Towner* v. *Hansen*, *supra*, 302 N.W.2d at p. 765.)

However the South Dakota Supreme Court disagreed with the Montana and North Dakota courts and held that ". . . commercial cattle herds raised for sale at public livestock markets are collateral 'of a type customarily sold on a recognized market' for purposes of [UCC section 9504(3)]." (*First Nat. Bank of Minneapolis* v. *Kehn Ranch* (S.D. 1986) 394 N.W.2d 709, 715, fn.

---

[10]See cases collected at 9-504 through 11-108 Uniform Commercial Code Case Digest (1988) section 9504.31, pages 162-170.

omitted.) The court stated, "Admittedly the cattle market is not identical to the New York Stock Exchange or the bond markets. But like the stock exchange, prices paid for cattle are available by quotation on a daily basis, as are prices paid for shares on the NYSE. Furthermore, when the Bank took possession of the security, cattle were being traded daily on the commodity futures markets, similar to grain and other commodities. Under such a marketing system there is no room for bidding on individual cattle, and '[t]he forces of supply and demand determine price and the valuation of goods. . . .' [Citation.]" (*Ibid.* Accord, *Cottam* v. *Heppner, supra,* 777 P.2d 468.)

In *American Parts System* v. *T & T Automotive* (Minn.Ct.App. 1984) 358 N.W.2d 674 the court held collateral consisting of an inventory of new auto parts was " 'of a type customarily sold on a recognized market.' " (*Id.* at p. 677 quoting Minn. Stat. §§ 336.9-504(3) (1982).) ▇▇ Aspen argues if there is a recognized market for new auto parts, there is also one for new tires. Based upon the facts asserted in Aspen's opening statement, we are inclined to agree.

▇▇ We adopt the view that a recognized market within the meaning of section 9504, subdivision (3) is one where sales involve many items so similar that individual differences are nonexistent or immaterial, where haggling and competitive bidding are not primary factors in each sale, and where the prices paid are currently available by quotation. The question of whether there is a recognized market for any particular collateral within the meaning of section 9504, subdivision (3) is generally a question of fact, although some courts have decided the question as one of law based on the relevant underlying facts. (Compare *M.P. Crum Co.* v. *First Southwest Sav. & Loan* (Tex.Ct.App. 1986) 704 S.W.2d 925 [question of whether collateral consisting of home mortgages was of a type customarily sold in a recognized market submitted to jury to be decided by special verdict] and *Cottam* v. *Heppner, supra,* 777 P.2d at p. 471 [jury made finding that debtors' cattle were collateral customarily sold on a recognized market]; with *State Bank of Towner* v. *Hansen, supra,* 302 N.W.2d at p. 765 [holding there is no recognized market for cattle and used farm machinery as a matter of law].)

▇▇ In the instant case, the question of whether there is a recognized market for new tires is a question of fact turning on the jury's resolution of the underlying questions of whether the sale of tires involves many items so similar that individual differences are nonexistent or immaterial, whether haggling and competitive bidding are absent as primary factors in each sale, and whether the wholesale prices paid for tires are currently available by

quotation. In its stipulated opening statement, Aspen alleged the following facts which support a finding of a recognized market for tires under the aforementioned test:

"There is an established and recognized wholesale market for new tires in Southern California. The market demand for tires in this region is one of the greatest in the world, and the fierce competition has resulted in *relatively identical wholesale prices for comparable tires. . . .* There is *little or no price differential between tires sold by competitors* when comparing tires of similar brand names, size, quality, and performance.

"Aspen and its competitors publish price lists of their wholesale tire prices for dissemination to tire retailers. Although the published prices for individual tires may vary a little, the actual wholesale price differential is virtually nonexistent when a competitor's advertising, credit terms and incentives are taken into consideration. In this recognized market, *there is no haggling or competitive bidding for each sale. Rather, the prices paid for sales of comparable tires are always available by quotation from published price lists.*" (Italics added.)

In ruling on Bodge's motion for nonsuit, the court should have assumed Aspen would prove its asserted facts going to the issue of whether there is a recognized market for new tires. Based on those facts, a jury could reasonably conclude there is a recognized market for new tires such that Aspen was not required to give notice of its disposition of the tires repossessed from Bodge, pursuant to section 9504, subdivision (3). Accordingly, the court erred to the extent its granting of nonsuit was based on Aspen's failure to give proper notice of its intended disposition of the tires.

### V

*Did the Trial Court Err in Basing Its Grant of Nonsuit on Aspen's Retention of the Collateral?*

Without citing any supporting authority, the trial court decided that Aspen was barred from seeking a deficiency judgment because it elected to retain the repossessed collateral rather than conducting a sale. Since Aspen's opening statement establishes the collateral *was* sold "or otherwise disposed of" under section 9504, as discussed above, the court erred in basing nonsuit on the conclusion that Aspen elected to retain the collateral in lieu of a sale.

Assuming arguendo the collateral was not sold but retained and commingled, as permitted by section 9207, the trial court nevertheless erred in ruling

as a matter of law that such retention bars a deficiency judgment. *In re Crosby* (Bankr. 9th Cir. 1994) 176 Bankr. 189 is instructive. *Crosby* noted:

". . . there exist three points of view on whether a secured party should be held to have retained collateral in satisfaction of a debtor's obligation, even though the security holder never made a proposal in writing [as required by section 9505].[11]

"Under the first viewpoint, '[a]n election to take the collateral in full satisfaction will not be implied; it must be made by written notice to the debtor.' [Citation.]

"While both the second and third viewpoints allow implied elections to retain collateral in satisfaction of indebtedness, one is based on duration and the other on the secured party's intent. The second viewpoint holds that an election may be implied from an unreasonably prolonged retention of collateral by the secured party. [Citation.] . . .

"The third viewpoint allows an implied election, but only if it is shown that the secured party manifested an intent to accept the collateral in satisfaction of the obligation. [Citation.] The debtor bears the burden of showing that the secured party manifested an intent to retain the collateral in satisfaction of the obligation under the third viewpoint. [Citation.]" (176 Bankr. at p. 193.)

*Crosby* noted the California Supreme Court has not decided which viewpoint is to be followed in California, and apparently no California appellate court has addressed the issue either. However, under any of the viewpoints adopted by other jurisdictions it would be error to conclude as a matter of law, based on Aspen's opening statement, that Aspen elected to retain the repossessed tires, worth about $7,000, in full satisfaction of a debt in an amount exceeding $103,000.

First, there is no indication in Aspen's opening statement, nor does Bodge contend, that Aspen gave written notice of such election to Bodge under section 9505.

Second, whether a sale of collateral is conducted in a commercially reasonable manner is generally a question of fact. (*U.S. Roofing, Inc.* v.

---

[11]Section 9505, subdivision (2) provides, in pertinent part: "[A] secured party in posession [of collateral] may, after default, propose to retain the collateral in satisfaction of the obligation. Written notice of such proposal shall be sent to the debtor if he has not signed after default a statement renouncing or modifying his rights under this subdivision. . . ."

*Credit Alliance Corp.* (1991) 228 Cal.App.3d 1431, 1453 [279 Cal.Rptr. 533].) Accordingly, assuming the tires were retained and not sold or "otherwise disposed of," whether Aspen's delay in conducting a sale was unreasonable to the point of constituting an implied election to retain the tires in satisfaction of the entire debt is a question of fact to be decided at trial. Such implied election cannot be deemed to have been made as a matter of law based on Aspen's stipulated opening statement construed in the light most favorable to Aspen.

Finally, there is nothing in Aspen's stipulated opening statement from which it could be inferred Aspen intended to accept the tires in satisfaction of the entire debt. To the contrary, Aspen expressly stated in its opening statement, "At no time did Aspen intend to take the repossessed tires in satisfaction of the $103,000 debt."

The trial court erred in concluding Aspen was barred from seeking a deficiency judgment because it elected to retain rather than sell the collateral.

## VI

### Conclusion

Aspen's action is not properly viewed as a unified foreclosure action under section 9501, subdivision (4)(a)(ii) because it would not be commercially reasonable for Aspen to foreclose against its real and personal property collateral in a single unified foreclosure sale as contemplated by that provision. Therefore, Aspen's proceedings against its personal property collateral are governed by the California Uniform Commercial Code.

It was error to grant nonsuit against Aspen on the ground Aspen failed to comply with the notice-of-sale requirement of section 9504, subdivision (3). The facts alleged in Aspen's stipulated opening statement establish that Aspen sufficiently complied with that notice requirement by notifying Bodge it had inventoried the repossessed tires and credited Bodge for their wholesale value prior to returning the tires to inventory to be sold in the course of business. Alternatively, nonsuit on that ground was improper because the trier of fact could have found, based on the factual contentions in Aspen's stipulated opening statement, that the repossessed tires were collateral "of a type customarily sold on a recognized market" within the meaning of section 9504, subdivision (3), and therefore could be sold without notice to Bodge, pursuant to that section.

Nonsuit was not properly granted on the ground Aspen elected to retain the collateral in full satisfaction of the debt because it could not be concluded from Aspen's stipulated opening statement that the collateral was

retained. Alternatively, assuming the collateral was retained, it could not be concluded from Aspen's stipulated opening statement that written notice of intent to retain the collateral in satisfaction of the debt was given pursuant to section 9505, that Aspen's retention of the collateral was of an unreasonable duration, or that Aspen manifested any intent to retain the collateral in satisfaction of the debt.

### DISPOSITION

The judgment of nonsuit is reversed and the case is remanded for trial. Defendants' cross-appeal is moot and therefore dismissed.

Benke, Acting P. J., and Nares, J., concurred.

A petition for a rehearing was denied September 27, 1995, and the petition of defendants and appellants for review by the Supreme Court was denied December 21, 1995. Mosk, J., was of the opinion that the petition should be granted.