LARSON, Senior District Judge.
Richard and Bonnie Justice appeal from the Judgment entered on a jury verdict in favor of respondent David Carter. The district court[1] denied the Justices’ Motion for New Trial without further comment or explanation. On appeal, the Justices challenge the court’s decision, alleging error 1) in the submission of Jury Instruction 16A, 2) in the court’s refusal to admit certain evidence, and 3) in the denial of the Justices’ Motion in Limine, seeking to enlarge the time for identification of expert witnesses who would testify regarding emotional damages. Carter cross-appeals. We affirm the judgment of the district court.
I.
The Justices were farmers in South Dakota from 1962 until approximately 1987. Encountering financial difficulties in the early 1980's, the Justices made no payments on their land mortgage, held by Prudential Insurance Company, in 1984, 1985, and 1986. In May of 1986, Prudential initiated a mortgage foreclosure action. In July of 1986, Prudential received a foreclosure judgment, and in August the land was sold at a sheriff’s sale. In early 1987, Valley National Bank (the operating lender) foreclosed on all of the Justices’ chattel. In February of 1987, the Justices filed for protection as family farmers under Chapter 12 of the Bankruptcy Code. Prudential and Valley National vigorously opposed the Justices’ reorganization plan. The Justices’ arguments that a plan of reorganization could be filed and confirmed during the redemption period and, thus, that the use of cash collateral should be approved, was rejected by the bankruptcy court, the district court, and ultimately by this court. See Justice v. Valley National Bank, 849 F.2d 1078 (8th Cir.1988). The Justices’ bankruptcy filing was then converted to a Chapter 7 liquidation case and all property was liquidated. In August of 1989, the Justices filed this legal malpractice action against their attorney, David Carter. The intervening events were the subject of much dispute at trial.
Carter met with the Justices on May 2, 1986, the day after the Justices received the mortgage foreclosure notice. Carter discussed with the Justices the procedure, benefits, and risks of filing for bankruptcy. Carter advised the Justices to file for bankruptcy prior to the foreclosure judgment. On May 20, 1986, and on June 30, 1986, Carter wrote to the Justices, reiterating his advice. Shortly before the summary judgment foreclosure hearing on July 7, 1986, Carter again discussed bankruptcy with the Justices, and again stressed the importance of filing prior to foreclosure. The Justices however, repeatedly rejected Carter’s advice, choosing instead to rely upon their own efforts to refinance the entire farming operation through independent sources. The Justices expressed concern that a bankruptcy filing would have an adverse impact upon their refinancing opportunities. Unbeknownst to Carter, the Justices signed an agreement securing a “finders fee” on a 1.5 million dollar loan on July 1, 1986. It was represented to the Justices by the independent lenders that they were certain to receive the loan. At the July 7 meeting, Carter responded in the affirmative to the Justices’ inquiries whether there was a “chance” of recovering their property if they filed for bankruptcy after foreclosure. In October of 1986, Carter again wrote to the Justices, confirming their decision not to pursue bankruptcy. The Justices continued negotiations with the independent lenders. When Valley National *954 commenced foreclosure proceedings in early 1987, the Justices finally authorized Carter to file a bankruptcy petition, leading to the adverse decision in Justice v. Valley National Bank.
The Justices testified at trial that Carter failed to advise them of the adverse consequences arising from failure to file bankruptcy prior to the foreclosure judgment and sheriff’s sale. Pointing to various correspondence from Carter, the Justices alleged that Carter did not fully understand the timing or the import of the various decisions, allowing the Justices to reach the point of no return without adequate warning. The Justices also alleged that Carter advised them that they could recover their land through a bankruptcy proceeding even after the sheriff’s sale.
II.
A. Jury Instruction 16A
The critical issue at trial, and the issue upon which many of the alleged errors on appeal turn, is the feasibility of the Justices’ hypothetical Chapter 11 reorganization effort. In other words, would the Justices reorganization plan have been filed, confirmed, and successful, but for attorney Carter’s negligence?
Jury Instruction 16A states:
A plan of reorganization under Chapter 11 of the Bankruptcy Code will be confirmed if it appears reasonably probable that the farmer can pay the restructured debt, over a reasonable period of time, at a reasonable rate of interest, in light of farm prices and farm programs as of the date of confirmation; and, that the Plan requires the farmer to pay the full face value of the debt with accrued principal and interest.
Simply because a Plan of reorganization is confirmed does not mean that the Plan will be successful. In order for the Plan of reorganization to be successful, the farmer must, in fact, repay all of the restructured debt according to the terms of the Plan of reorganization.
Authority for this instruction is 11 U.S.C. § 1129(b)(2)(B)(ii), which states with regard to plan confirmation:
(2) For the purpose of this subsection, the condition that a plan be fair and equitable with respect to a class includes the following requirements:
(B) With respect to a class of unsecured claim—
(ii) the holder of any claim or interest that is junior to the claims of such class will not receive or retain under the plan on account of such junior claim or interest any property.
Referred to as the absolute priority rule, this section of the Bankruptcy Code provides that unsecured creditors have absolute priority over any junior equity interest to receive all money or property distributed, until the unsecured creditors are paid in full under the reorganization plan.
The Justices do not claim that the jury instruction is an incorrect statement of the law but, rather, that the eighth circuit’s interpretation of the Bankruptcy Code, as pronounced in In re Ahlers, 794 F.2d 388 (8th Cir.1986), rev’d sub nom., Norwest Bank Worthington v. Ahlers, 485 U.S. 197, 108 S.Ct. 963, 99 L.Ed.2d 169 (1988), was the binding law at the time of their hypothetical reorganization. (The respective dates of the eighth circuit and the Supreme Court decisions are July 2, 1986, and March 7, 1988.) Petitioners in In re Ahlers argued that the absolute priority rule barred the feasibility, and ultimately the confirmation, of any plan which allowed respondents to retain an equity interest in their farm, an interest junior to creditors’ unsecured claims. The eighth circuit held that,
[T]he absolute priority rule did not bar respondents from retaining their equity interest if they contributed ‘money or money’s worth’ to the reorganized enterprise, and that their yearly contributions of ‘labor, experience, and expertise’ would constitute such a contribution, therefore permitting confirmation of a *955 reorganization plan over petitioners’ objections.
Norwest Bank Worthington, 485 U.S. at 197, 108 S.Ct. at 963. The eighth circuit thus carved out an exception to the absolute priority rule for farm reorganizations. The Supreme Court, however, reversed the eighth circuit, stating that the absolute priority rule was applicable and that respondents’ promise of future labor-warranted no exception to the operation of the rule. “Relief from current problems facing farm families cannot come from a misconstruction of the bankruptcy laws....” Id. at 198, 108 S.Ct. at 964.
The Justices’ contention that we must adhere to the statutory law as it was interpreted by the courts at the time of the parties’ actions is inviting. The Justices’ arguments of legal certainty and justifiable reliance are particularly appealing. However, the Supreme Court has instructed us that a high court decision construing a statute as Congress intended it be construed should be given full retroactive effect, except in certain rare instances. United States v. Estate of Donnelly, 397 U.S. 286, 90 S.Ct. 1033, 25 L.Ed.2d 312 (1970). The district court in that case, 295 F.Supp. 557 (E.D.Mich.1967), affirmed by the Court of Appeals for the Sixth Circuit, 406 F.2d 1065 (6th Cir.1969), held, in part, that respondents were entitled to rely upon the prevailing interpretation of a federal statute as it appeared in Youngblood v. United States, 141 F.2d 912 (6th Cir.1944). Conceding that the sixth circuit’s interpretation had been rejected by the Supreme Court in an unrelated opinion one year after respondents’ good faith purchase of land encumbered by a federal tax lien, the district court nevertheless concluded that the high court decision should not be applied retroactively, thus upsetting respondents’ allegedly justifiable expectation of unclouded title. Estate of Donnelly, 397 U.S. at 291, 90 S.Ct. at 1036. The Supreme Court reversed. In its decision, the Court distinguished an earlier, apparently contrary decision, Chicot County Drainage District v. Baxter State Bank, 308 U.S. 371, 60 S.Ct. 317, 84 L.Ed. 329 (1940), in which the subsequent, unrelated declaration of the unconstitutionality of a statute was not sufficient to uphold a new action, where final judgment had been previously rendered on the same facts. The new action was barred by res judicata regardless of the unconstitutionality of the statute upon which it relied.
The past cannot always be erased by a new judicial declaration. * * * Questions of rights claimed to have become vested, of status, of prior determinations deemed to have finality and acted upon accordingly, of public policy in the light of the nature of both of the statute and of its previous application, demand examination.
Chicot, 308 U.S. at 374, 60 S.Ct. at 318. Specifically citing the lack of the element of res judicata, the Supreme Court in Estate of Donnelly stated:
Acts of Congress are generally to be applied uniformly throughout the country from the date of their effectiveness onward. Generally the United States, like other parties, is entitled to adhere to what it believes to be the correct interpretation of a statute, and to reap the benefits of that adherence if it proves to be correct, except where bound to the contrary by a final judgment in a particular case. Deviant rulings by circuit courts of appeals, particularly in apparent dictum, cannot generally provide the “justified reliance” necessary to warrant withholding retroactive application of a decision construing a statute as Congress intended it. In rare cases, decisions construing federal statutes might be denied full retroactive effect, as for instance where this Court overrules its own construction of a statute, [citation omitted], but this is not such a case.
Estate of Donnelly, 397 U.S. at 294-295, 90 S.Ct. at 1038. The concurring opinion of Justice Harlan sheds additional light. Concerned about a “retroactivity quagmire” in civil litigation, Justice Harlan states:
The critical factor in determining when a new decisional rule should be applied to a transaction consummated prior to the decision’s announcement is, in my view, the point at which the transaction has ac *956 quired such a degree of finality that the rights of the parties should be considered frozen. Just as in the criminal field the crucial moment is, for most cases, the time when a conviction has become final ... so in the civil area that moment should be when the transaction is beyond challenge either because the statute of limitations has run or the rights of the parties have been fixed by litigation and have become res judicata.
Estate of Donnelly, 397 U.S. at 296, 90 S.Ct. at 1039 (Harlan, J., concurring).
The “crucial moment,” or the moment of final judgment, under the majority opinion, did not occur in the instant case until the judgment was entered on the jury’s verdict in the malpractice action. The Justices may not rely upon a misconstruction of the bankruptcy laws, arguing that any other ruling creates a legal fiction, when hindsight does indeed allow us to see that the parties’ actions were anything but frozen in time. If we were to fix the law at that time, without benefit of the later Norwest Bank Worthington decision, we would be creating a legal fiction ourselves. We would be negating the possibility that the critical date, the date of confirmation of the hypothetical plan, may not have occurred until after the subsequent reversal of In re Ahlers. (There is continuing, vigorous debate between the parties on this issue.) We would also be negating the possibility that the creditors of the Justices may have appealed, anticipating and urging the reversal of In re Ahlers. It is a peculiar facet of the nature of a legal malpractice action which allows us the use of hindsight in analyzing such uncertainties and determining the correct application of a federal statute. The district court did not err in its submission of Jury Instruction 16A to the jury.
B. Evidentiary Objections
This court will not reverse on appeal a district court’s rulings on the admissibility of evidence absent a clear and prejudicial abuse of discretion. United States v. St. Pierre, 812 F.2d 417 (8th Cir.1987).
First, the Justices’ contention that they have been highly prejudiced by the exclusion of a document entitled “Revised Chapter 12 Plan” is without merit. Prepared by Carter in support of the Justices’ petition for reorganization under Chapter 12, the exhibit purported to show that the Justices had adequate cash flow to service restructured debt under a Chapter 11 reorganization plan. Despite the court’s decision to deny admission of the exhibit, the facts contained in the exhibit, as well as the fact that they were figures originally prepared by Carter, were made abundantly clear to the jury. The Justices suffered no prejudice by the court’s decision.
Second, the Justices’ expert was precluded from testifying that Chapter 11 plans were confirmed during the period in question, without unanimous creditor approval, pursuant to In re Ahlers. Our discussion of the absolute priority rule, above, is dispositive of this issue. The district court did not abuse its discretion in not admitting expert testimony which was based upon an inapplicable interpretation of the law.
Third, the district court refused the admission of several unrelated bankruptcy cases, purportedly supporting the testimony of another of the Justices’ experts that the Justices’ reorganization plan was feasible. The “comparable” cases represented three successful Chapter 11 bankruptcy cases filed within similar times and geographic locations as the Justices arguably would have filed, as well as three successful Chapter 11 cases handled by Carter. The Justices argue that the evidence was “specialized knowledge” within the meaning of Rule 702 of the Federal Rules of Evidence, offered to explain the workings, dynamics, and outcome of a hypothetical bankruptcy ease. However, a careful reading of the argument reveals that the Justices ultimately sought to convince the jury that, on a scale of probabilities, a particular judge in that particular district would have confirmed their reorganization plan. In other words, as Carter contends, the jury would simply have been informed of the local bankruptcy judge’s *957 predilections and his high rate of confirmations. The district court refused the evidence as cumulative and, therefore, not useful in assisting the jury in evaluating the expert testimony. We agree, as the record reveals that evidence was offered on several occasions at trial of the local judge’s proclivity toward confirmation of farm debtors’ reorganization plans. In addition, the Justices suffered no prejudice, as the documents, while not received into evidence, were used in the cross-examination of Carter’s expert.
Notwithstanding the court’s ruling, we feel compelled to comment further on the use of this type of evidence in a malpractice case. First, it is absolutely clear that the admissibility of expert testimony is determined by answering the question: Does the testimony assist the trier of fact?
There is no more certain test for determining when experts may be used than the common sense inquiry whether the untrained layman would be qualified to determine intelligently and to the best possible degree the particular issue without enlightenment from those having a specialized understanding of the subject involved in the dispute.
Fed.R.Evid. 702 advisory committee’s note.[2] Evidence that “comparable” court cases were confirmed does not clear this hurdle. It is not knowledge beyond the grasp of the ordinary fact finder; the untrained layman would have no difficulty understanding and intelligently weighing such evidence. Moreover, admission of the evidence would result in a battle of the experts — the defense offering an equal number of unconfirmed cases, and each side engaging in the time consuming and arduous task of differentiating the others’ cases — an exercise which would be wasteful, and not in the least enlightening for the jury.
Most important, the question of what a particular judge would have decided, at best a game of chance based upon a study of the probabilities, has no place in the jury’s determination. Although the issue at hand in the malpractice case is a determination of the outcome of the underlying bankruptcy case, the jury in the malpractice case is permitted to decide this by substituting its judgment for the judgment of the factfinder, be it jury or judge, in the earlier case. Reconstructing the probable behavior, thought process, and attitude of the judge in the earlier case is neither necessary, nor prudent. We are confident that the second jury, bombarded with facts and expert opinions, and properly instructed on the law, could reasonably and soundly apply the law to the facts and resolve the issue of what a reasonable judge would have decided. Any less objective standard exposes defendants to a troublesome and ever changing standard which turns upon the uncertainties of human abilities and behavior. See Chocktoot v. Smith, 280 Or. 567, 571 P.2d 1255 (1977). See also Helmbrecht v. St. Paul Ins. Co., 122 Wis.2d 94, 362 N.W.2d 118 (1985). The district court clearly did not abuse its discretion in denying admission of the evidence.
C. Damages
The Justices moved for additional time within which to identify expert witnesses who would testify to the psychological damages allegedly suffered by the Justices as a result of Carter’s negligence. Specifically, the Justices sought damages for emotional distress and loss of lifestyle. The district court denied the motion, holding that, under South Dakota law, there was no basis to submit the issues of mental anguish, emotional distress, or loss of lifestyle to the jury in this legal malpractice case. Having reviewed de novo the questions of state law at issue, we conclude that no error of law appears and that the Justices’ motion in limine was properly denied.
D. Cross-appeal
It is not necessary for this court to consider the merits of Carter’s cross-appeal, as our holding on the Justices’ direct appeal is dispositive of the case.
*958 III.
For the foregoing reasons, the judgment of the district court is affirmed in all respects.

. The Honorable John B. Jones, Chief Judge, United States District Court for the District of South Dakota.

. Ladd, Expert Testimony, 5 Vand.L.Rev. 414 (1952).