[No. A092345. First Dist., Div. Two. Aug. 14, 2001.]

PAT LOMBARDO et al., Plaintiffs and Appellants, v.
KURT D. HUYSENTRUYT, Defendant and Respondent.

**COUNSEL**

Hanson, Bridgett, Marcus, Vlahos & Rudy, David W. Baer, Andrew G. Giacomini and S. Anne Johnson for Plaintiffs and Appellants.

Drath, Clifford, Murphy, Wennerholm & Hagen, John M. Drath and Ray Z. Bacerdo for Defendant and Respondent.

## OPINION

**KLINE, P. J.**—Attorney Kurt D. Huysentruyt represented Paul J. Winters when the latter attempted to amend a trust he had established to make appellants its beneficiaries. The amendment was ruled ineffective by the probate court. Subsequently, appellants sued Huysentruyt for malpractice. They now appeal the superior court's grant of nonsuit to Huysentruyt, contending that the superior court erred in finding that the probate court's ruling superseded Huysentruyt's negligence in causing their damages. Appellants further request sanctions against respondent for failing to timely file his brief on appeal. We reverse.

### STATEMENT OF THE CASE AND FACTS

In May 1995, Paul Winters established a trust, naming as cotrustees himself and Regina Fellman, whom he had recently married. Winters was nearly 90 years old and Fellman was 72. The trust provided that if Fellman predeceased Winters, upon Winters's death all the trust assets would be distributed to Fellman's adult daughter from a prior marriage, Diane Mirviss. Winters reserved the right to terminate or amend the trust.

In late May 1996, Winters was hospitalized and diagnosed with dehydration, renal failure and Alzheimer-type dementia. Soon thereafter, Fellman petitioned for a conservatorship of Winters's person and estate, requesting orders to have Mirviss replace Winters as cotrustee and to restrict Winters's power to revoke or amend the trust without prior court approval. The court granted these orders and subsequently replaced Fellman as conservator with professional conservator Barbara deVries. The court entered an order which provided: "During the pendency of these proceedings, the conservatee shall not have the power either to amend or to revoke The Paul J. Winters Trust, U/T/A dated June 23, 1995, without the prior approval of this Court."

On August 2, 1997, Fellman died of colon cancer. Accordingly, Mirviss became the sole trustee and beneficiary of the trust. Winters had been telling deVries that he wanted to change his trust and she sought a court-appointed lawyer for him. Respondent accepted the appointment.

Respondent met with Winters on September 9 and 10, 1997. Winters was "adamant" that he did not want Mirviss to act as successor and trustee of the

trust or benefit from his estate and remained adamant on this point until his death. Winters was in a convalescent hospital; respondent was aware he had been released from the hospital two days before and had a heart condition that respondent understood to be life threatening. Respondent told Winters there was "some sense of urgency" about making decisions on his estate plan. Respondent was aware of the order restricting Winters's power to amend the trust from his review of the case file and had not previously seen an order like it. He understood from the order that the court would prefer application be made to the court for authority to amend before a trust amendment was executed, although he felt the order was ambiguous as to whether court approval would be required before an amendment was signed and he did not think the court would "refuse to inquire into the circumstances of his signing the trust amendment prior to obtaining court approval." Appellants' expert, John Hartog, had also never seen an order like this and characterized it as "unique" and "ambiguous." Respondent's expert, Barbara Jagiello, had not seen an order like it either and found it "confusing," but did not see anything in the order to indicate the court would not consider the validity of a testamentary trust after the trustor's death. Respondent's other expert, Bruce Friedman, found the order "astonishing."

Respondent met with Winters again on September 25 and then on October 21, 1997. During this time, Winters was uncertain how he wanted to dispose of his estate. On October 21, Winters asked respondent to ask his friends, John Hult and Pat Lombardo, to call him about his estate plan. Respondent made these calls on November 12. Hult reported to respondent "almost immediately" that Winters wanted to leave his estate to appellants. When respondent next met with Winters on November 18, Winters showed him a piece of paper with five names, four matching the ones Hult had provided but the fifth being a Dr. Morabito and not Lombardo. Winters then indicated he wanted to give Lombardo $15,000 and have him be trustee, and was not sure he wanted to give anything to Morabito. Respondent suggested making deVries the trustee but Winters disagreed.

On November 20, respondent told the court investigator, John Cusher, and deVries that he thought Winters was coming to a decision on his estate plan. On November 24, deVries told respondent that Winters had had a heart incident and respondent felt it was more urgent to accomplish the trust amendment. On November 26, respondent prepared the trust amendment, providing for distribution of the trust assets in equal shares to John Hult, Pat Lombardo, Mary Dorcy, Albert (Butch) Winters and Maria Winters, and took it to Winters, but Winters was angry and refused to talk to him. Respondent returned to see Winters on December 5, on which date Winters signed the amendment and respondent notarized it. Respondent wanted to

meet with Winters once more before seeking court approval of the amendment, both to be sure Winters remained consistent regarding his choice of beneficiaries and to resolve whom Winters wanted as trustee, and planned to meet with him in mid-December. Winters died on December 14, 1997.

About a month after Winters's death, respondent filed a petition for approval of the trust amendment. Mirviss filed a petition to invalidate the amendment. By order of April 8, 1998, the probate court denied the petition for approval and granted Mirviss's petition, finding the amendment had been executed without the prior court approval required by prior court orders and was therefore invalid and void.

Appellants appealed the probate court's decision (*Conservatorship of Winters,* A082566), but while the appeal was pending settled with Mirviss for 55 percent of the trust assets. The appeal was dismissed on September 9, 1999. According to appellants, after deducting attorney fees, they received about $380,000 from Winters's $1,240,000 estate.

Meanwhile, on September 17, 1998, appellants Lombardo, Hult and Dorcy filed the present complaint for damages for professional negligence against respondent. Appellants claimed that respondent failed to take the steps necessary to cause the trust amendment to become effective upon Winters's death by failing to apply for court approval immediately upon receiving Winters's instructions, failing to immediately prepare the amendment, failing to immediately present the amendment to Winters for execution once it was prepared, failing to immediately apply for court approval after Winters executed the amendment and failing to apply for an order shortening time to have the court consider a petition for approval on an emergency basis. A first amended complaint filed on December 4, 1998, added appellants Albert Winters and Maria Winters as plaintiffs.

The matter came on for trial on February 10, 2000. A jury was empanelled on February 15. After considering the parties' motions in limine, however, the court came to the conclusion on February 18 that the probate court had erred in ruling that the trust amendment was invalid because it was signed without prior court approval. According to the superior court, because a court "is required to interpret an order to maintain its validity and constitutionality if it is possible," a reasonable court would have interpreted the order "in such a way that it did not limit the testamentary capacity of Mr. Winters" and would have held a hearing "to at least explore the circumstances surrounding the proposed amendment" either before or after Winters's death. Given this conclusion, the court questioned whether any negligence by respondent could be viewed as having resulted in any damages,

suggesting that it would not have mattered if respondent had handled matters differently because the court should have held a hearing in any event. The court rejected as calling for speculation appellants' counsel's argument that actionable negligence could be proved because the probate court's erroneous ruling was foreseeable. Respondent's attorney responded with a motion for nonsuit, which the trial court granted. The court's order, filed on April 14, 2000, includes the following findings and determinations as a matter of law:

"To maintain the validity and constitutionality of the Order if possible, a reasonable court should have interpreted the Order as not restricting the conservatee's testamentary ability to amend his trust. . . .

"Had Defendant filed a petition for approval of the amendment after its execution but before Paul Winters' death (i.e., on Friday December 5, 1997, or between Monday, December 8, 1997, and Friday December 12, 1997), a reasonable court should not have held a hearing on the petition before the death because such a court should have required proper notice to the trustee, and there was insufficient time to do that. However, a reasonable court should have granted a hearing to be conducted after Paul Winters' death to explore the circumstances surrounding the proposed amendment, whether the petition for approval of the amendment was filed before or after Winters' death. . . .

"Although in the Conservatorship proceeding the court denied Defendant's petition for approval of the Amendment without considering the Amendment on its merits, a reasonable court should have granted a hearing to at least explore the circumstances surrounding the Amendment.

"Since a reasonable judge should have considered the circumstances surrounding the Amendment after Defendant petitioned for its approval, it is inconsequential that Paul Winters died before the Amendment was brought to the court's attention in the Conservatorship proceeding and there is no causal connection between the conduct of the Defendant and the Plaintiffs' alleged damages."

Judgment was entered on June 26, 2000, and notice of entry of judgment was served on June 26 and filed on June 29, 2000. Appellants filed a timely notice of appeal on August 9, 2000.

## DISCUSSION

### I.

"A defendant is entitled to a nonsuit if the trial court determines that, as a matter of law, the evidence presented by plaintiff is insufficient to

permit a jury to find in his favor. (*Campbell* v. *General Motors Corp.* (1982) 32 Cal.3d 112, 117-118 [184 Cal.Rptr. 891, 649 P.2d 224, 35 A.L.R.4th 1036].) 'In determining whether plaintiff's evidence is sufficient, the court may not weigh the evidence or consider the credibility of witnesses. Instead, the evidence most favorable to plaintiff must be accepted as true and conflicting evidence must be disregarded. The court must give "to the plaintiff['s] evidence all the value to which it is legally entitled, . . . indulging every legitimate inference which may be drawn from the evidence in plaintiff['s] favor." ' (*Id.* at p. 118.) . . . [¶] ■ In reviewing a grant of nonsuit, we are 'guided by the same rule requiring evaluation of the evidence in the light most favorable to the plaintiff.' (*Carson* v. *Facilities Development Co.* (1984) 36 Cal.3d 830, 839 [206 Cal.Rptr. 136, 686 P.2d 656].) We will not sustain the judgment ' "unless interpreting the evidence most favorably to plaintiff's case and most strongly against the defendant and resolving all presumptions, inferences and doubts in favor of the plaintiff a judgment for the defendant is required as a matter of law." ' (*Ibid.*, quoting *Mason* v. *Peaslee* (1959) 173 Cal.App.2d 587, 588 [343 P.2d 805].)" (*Nally v. Grace Community Church* (1988) 47 Cal.3d 278, 291 [253 Cal.Rptr. 97, 763 P.2d 948].) Additionally, "we will not consider any ground for the nonsuit not advanced in the trial court, except one which identifies an incurable defect. (*Lawless* v. *Calaway* (1944) 24 Cal.2d 81, 92-94 [147 P.2d 604].)" (*Loral Corp.* v. *Moyes* (1985) 174 Cal.App.3d 268, 273 [219 Cal.Rptr. 836].)

Where a nonsuit is granted after opening argument, the reviewing court accepts as true the facts asserted in the opening statement and indulges every legitimate inference those facts support. (*Hoff v. Vacaville Unified School Dist.* (1998) 19 Cal.4th 925, 930 [80 Cal.Rptr.2d 811, 968 P.2d 522].) Similarly, here, we accept as true the facts stated in appellants' trial court briefs and argument. (See *Aspen Enterprises, Inc. v. Bodge* (1995) 37 Cal.App.4th 1811, 1817 [44 Cal.Rptr.2d 763] [parties stipulated that plaintiff's oral argument and supplemental brief in opposition to the motion for nonsuit would serve as its opening statement].)

■ Appellants contend that the trial court erred in holding as a matter of law that the probate court's ruling superseded respondent's alleged negligence in causing appellants' damages. They maintain that the probate court ruling could constitute a superseding cause only if it was not reasonably foreseeable and that foreseeability was a question of fact for the jury. They additionally argue that the probate court ruling could not supersede respondent's alleged negligence in failing to deliver the trust amendment to the trustee during Winters's lifetime.

Respondent characterizes the case differently, viewing the critical issue not as foreseeability of the probate court's ruling but as whether causation

depended on a legal ruling which presented a question of law for the court to decide. According to respondent, the threshold issue in the malpractice case was how a reasonable court should have ruled on the petition to amend the trust; the trial court correctly decided this issue as a question of law and concluded the probate court should have held a hearing on the validity of the amendment; and since a reasonable court should have considered the merits of the petition to amend the trust, no conduct of respondent's caused appellants' damages. Stated differently, in respondent's view, if the trust amendment was within the requirements of the conservatorship order (as properly interpreted), respondent's conduct could not be viewed as having caused appellants any damage; only if the amendment failed to comply with the order should the question of respondent's conduct have been submitted to the jury.

It should be stated at the outset that we do not find it necessary to determine whether the trial court was correct to find that the probate court's ruling on the trust amendment was erroneous, or whether appellants are presently in a position to maintain that the probate court's order was actually correct.[1] As will be explained, whether the probate court was correct or incorrect, factual questions existed as to liability in the present case and nonsuit was improperly granted.

■ "The elements of a cause of action for legal malpractice are (1) the attorney-client relationship or other basis for duty; (2) a negligent act or omission; (3) causation; and (4) damages. (*Nichols v. Keller* (1993) 15 Cal.App.4th 1672, 1682 [19 Cal.Rptr.2d 601]; see *Sukoff v. Lemkin* (1988) 202 Cal.App.3d 740, 744 [249 Cal.Rptr. 42] .)" (*Kurinij v. Hanna & Morton* (1997) 55 Cal.App.4th 853, 863 [64 Cal.Rptr.2d 324].) " 'Proof of legal malpractice requires proof not only of negligence by the lawyer but also of causation, a trial within a trial to establish that, but for the lawyer's negligence, the client would have prevailed in the underlying action.' [Citations.]" (*Id.* at p. 864.)

■ One aspect of causation is cause in fact or actual cause: Was the defendant's conduct " 'a substantial factor in bringing about the injury.' " (*Mitchell v. Gonzales* (1991) 54 Cal.3d 1041, 1049 [1 Cal.Rptr.2d 913, 819 P.2d 872].) The other is legal or proximate cause.

" ' "Legal cause" exists if the actor's conduct is a "substantial factor" in bringing about the harm and there is no rule of law relieving the actor from

---

[1]Respondent suggests that appellants are precluded from arguing that the probate court correctly interpreted the conservatorship order because they argued the invalidity of that order in their appeal from the probate court's ruling, although he does not actually pursue an estoppel argument since he views appellants as having conceded the probate court order was erroneous. Appellants respond that the doctrine of judicial estoppel is inapplicable here because it requires that the first tribunal accept the litigant's position as true.

liability. [Citations.]' " (*Rosh v. Cave Imaging Systems, Inc.* (1994) 26 Cal.App.4th 1225, 1235 [32 Cal.Rptr.2d 136], quoting *Nola M. v. University of Southern California* (1993) 16 Cal.App.4th 421, 427 [20 Cal.Rptr.2d 97].) ■ " 'The doctrine of proximate cause limits liability; i.e., in certain situations where the defendant's conduct is an actual cause of the harm, he will nevertheless be absolved because of the manner in which the injury occurred. Thus, where there is an independent intervening act which is not reasonably foreseeable, the defendant's conduct is not deemed the "legal" or proximate cause.' " (*Hardison v. Bushnell* (1993) 18 Cal.App.4th 22, 26 [22 Cal.Rptr.2d 106].) "In general, if the risk of injury is reasonably foreseeable, the defendant is liable. An independent intervening act is a superseding cause relieving the actor of liability for his negligence only if the intervening act is highly unusual or extraordinary and hence not reasonably foreseeable. (4 Witkin, Summary of Cal. Law (8th ed.) Torts, § 628; Rest.2d Torts, §§ 435, 447.) Reasonable foreseeability in this context is a question for the trier of fact." (*Cline v. Watkins* (1977) 66 Cal.App.3d 174, 178 [135 Cal.Rptr. 838].)

Causation is generally a question of fact for the jury, unless reasonable minds could not dispute the absence of causation. (*Constance B. v. State of California* (1986) 178 Cal.App.3d 200, 207 [223 Cal.Rptr. 645].) ■ Here, the trial court concluded that respondent's conduct did not cause any injury to appellants because if the probate court had properly construed its conservatorship order, the petition for approval of the trust amendment would have been considered on its merits at the time it was presented by respondent. Appellants, however, offered evidence—which must be accepted as true for purposes of reviewing the nonsuit (see *Hoff v. Vacaville Unified School Dist., supra,* 19 Cal.4th at p. 930)—that a reasonable attorney confronted with the conservatorship order involved here would have taken steps *before* execution of the trust amendment to *avoid* the result reached in the probate court. Specifically, appellants' expert testified in his deposition that respondent violated the standard of care by not filing a petition for instructions to determine the proper interpretation of the conservatorship order; not requesting the court to allow Winters to sign the trust amendment subject to court approval after execution; not seeking approval of the amendment more quickly after it was signed; and generally not acting with greater dispatch in handling the amendment. Appellants argue that the proper inquiry for the trial court was whether they would have prevailed in the probate court if respondent had taken any of these steps. For example, if respondent had requested clarification, would a reasonable court have construed the conservatorship order to permit the amendment Winters executed? If respondent had requested permission from the court for Winters to sign the amendment, subject to subsequent approval, would a reasonable court have granted the

request? If a reasonable court would have responded to such requests by allowing the amendment, respondent's failure to take these steps would be a substantial factor in causing appellants' injury.

If the probate court erred—if it should have entertained a hearing on the merits of the amendment despite respondent's failure to take earlier action to obtain court approval—this fact would alter the analysis only if the probate court's action could be viewed as a superseding cause of the injury. In *Skinner v. Stone, Raskin & Israel* (2d Cir. 1983) 724 F.2d 264, for example, the plaintiff sued attorneys who had represented him in a divorce action in which a default judgment was entered in favor of his former wife. The attorneys formally entered the case to move to vacate the default judgment on grounds that it was entered without proper notice; the trial court denied this motion but was reversed on appeal. In the malpractice action, the Second Circuit held that although the plaintiff, as a result of the appeal, was again in a position to contest the divorce case on the merits, he could recover expenses attributable to the defective default judgment (e.g., expenses in opposing enforcement of that judgment) if the default judgment resulted from the attorneys' negligence. The court pointed out that there was evidence from which a jury could conclude the attorneys could have taken steps to "head off" the entry of the default, as they had been provided with a copy of the proposed judgment a month before it was entered. According to *Skinner*, the attorneys could be held liable if their conduct was a proximate contributing cause of the injury unless the trial court's mistake was a superseding cause. (*Id.* at p. 266.)

As appellants point out, even if the probate court's ruling was erroneous, it cannot be viewed as unforeseeable as a matter of law. As an abstract principle, it is always foreseeable that a trial court will err, as evidenced by the existence of appellate courts. In the case before us, there is clearly evidence that the probate court's ruling was unforeseeable. The literal language of the conservatorship order required prior approval for a trust amendment. Respondent acknowledged in his deposition that he believed the conservatorship order indicated the probate court would prefer approval of a trust amendment before execution. The deposition testimony of the parties' expert witnesses demonstrates that they, too, viewed the conservatorship order as appearing to require prior approval of the trust amendment. Indeed, the experts—both appellants' and respondent's—viewed the order as "unique," "ambiguous," "astonishing" and "confusing," because the order appeared to require prior approval of the court for a testamentary disposition that normally would not be subjected to such a requirement. Even if the probate court was in fact wrong to insist on prior approval of the amendment, there was abundant evidence that respondent could have foreseen from

the language of the conservatorship order that it might do so, and might have been able to protect against this result by seeking the prior approval the order appeared to require, or attempting to clarify the interpretation of the order. Faced with a highly unusual order that appeared to impose a requirement for the amendment of the trust of an elderly client, in rapidly failing health, who unequivocally wanted to change the beneficiary of the trust, respondent had an obligation to take all reasonable steps to avoid having the conservatorship order interfere with the effectuation of his client's wishes. Acting in violation of the apparent requirement of the order—even if respondent believed that requirement to be improper—subjected appellants to unnecessary risk. ■ "An attorney owes a duty to his client to employ that degree of knowledge, skill, and judgment ordinarily possessed by members of the legal profession in carrying out the services for his client. [Citation.] One of these obligations is anticipating reasonably foreseeable risks. [Citation.]" (*Temple Hoyne Buell Foundation v. Holland & Hart* (Colo.Ct.App. 1992) 851 P.2d 192, 198 [attorney could be liable for negligence in drafting option contract that did not in fact violate rule against perpetuities for failure to protect against likelihood of litigation concerning applicability of the rule], italics omitted.)

■ When an attorney is charged with negligence, the question is what result would have been reached by a reasonable court if the attorney had not engaged in the conduct alleged to be negligent. The standard is objective; it does not ask what the *same* court would have done under different circumstances but what the result *should* have been if the attorney had acted differently. "The trial-within-a-trial method does not 'recreate what a particular judge or fact finder would have done. Rather, the jury's task is to determine what a reasonable judge or fact finder would have done . . . .' (*Brust* v. *Newton* (1993) 70 Wn.App. 286 [852 P.2d 1092].) Even though 'should' and 'would' are used interchangeably by the courts, the standard remains an objective one. The trier of facts determines what should have been, not what the result would have been, or could have been, or might have been, had the matter been before a particular judge or jury. (*Phillips* v. *Clancy* (1986) 152 Ariz. 415 [733 P.2d 300]; *Harline* v. *Barker* (Utah 1996) 912 P.2d 433, 441; *Justice* v. *Carter* (8th Cir. 1992) 972 F.2d 951, 956-957; 4 Mallen & Smith, Legal Malpractice, *supra*, § 32.1, pp. 127-129.)" (*Mattco Forge, Inc. v. Arthur Young & Co.* (1997) 52 Cal.App.4th 820, 840 [60 Cal.Rptr.2d 780], italics omitted.)[2]

■ The trial court's analysis of this case did not consider what a reasonable court would have done if respondent had acted in the manner

---

[2] We note that in the present case, if it should become necessary to determine whether the probate court's ruling was correct or incorrect, the responsibility to resolve this legal question would fall to the trial court and not to the jury. (See *Martin v. Hall* (1971) 20 Cal.App.3d 414, 420 [97 Cal.Rptr. 730, 53 A.L.R.3d 719].)

appellants' expert testified a competent attorney would have. Rather, the court asked what a reasonable court faced with respondent's actual conduct should have done and, because it believed the probate court did not so act, the court concluded that there was no causal link between respondent's conduct and appellants' injury. In effect, the court was passing judgment on the nature of respondent's conduct: By determining that a proper interpretation of the conservatorship order would have allowed for a hearing on the merits of the trust amendment either before or after Winters's death, the trial court determined that respondent engaged in no erroneous conduct. Indeed, respondent so characterizes the matter on appeal, arguing that "[a]s there was no erroneous conduct on Huysentruyt's part, the trial court was correct to conclude that the element of causation could not be shown."

This reasoning confuses the issues of causation and breach of the standard of care: If respondent engaged in no erroneous conduct, appellants' case would be defeated because there was no negligent conduct, not because that conduct did not cause appellants' injury. This was not the basis of the nonsuit. The trial court granted nonsuit on grounds of absence of causation. Because appellants offered evidence that respondent's conduct breached the standard of care, the trial court should have considered what a reasonable court should would have done if respondent had acted in conformance with the standard of care. The trial court's view of the case serves to exonerate respondent because of what it considered to be the probate court's error when, according to the evidence offered by appellants, respondent could have headed off any such error by recognizing the ambiguity in the conservatorship order and acting to protect against the possibility that the probate court would enforce its harshest—but most literal—interpretation. Such exoneration would be appropriate only if the probate court's alleged mistake could be viewed as a superseding cause. (*Skinner v. Stone, Raskin & Israel, supra,* 724 F.2d at p. 266.) Here, it could not, because there was evidence the probate court's order was foreseeable.

On the other hand, if the probate court's order was in fact correct, the existence of factual issues as to respondent's liability is even more apparent. If the conservatorship order, properly construed, required prior approval before the trust amendment was executed, respondent would be liable if his failure to obtain such prior approval constituted sustained conduct and was the proximate cause of appellant's injury. The evidence discussed above as creating factual issues regarding respondent's conduct in failing to seek clarification of the order or approval from the court for the amendment clearly demonstrates the existence of factual issues under this scenario as well.

Appellants additionally maintain that the nonsuit should not have been granted because—independent of any error by the probate court—respondent

was negligent in failing to deliver the trust amendment to the trustee during Winters's lifetime, an omission that would have been fatal to the amendment if the probate court had considered it on the merits. Appellants assert that Winters's trust set forth no method for modification and respondent does not dispute this point. ▇▇ When a revocable trust does not expressly provide an exclusive method for modification or amendment, it may be modified "by a writing (other than a will) signed by the settlor and delivered to the trustee during the lifetime of the settlor." (Prob. Code, § 15401, subd. (a)(2); see also Prob. Code, § 15402; *Conservatorship of Irvine* (1995) 40 Cal.App.4th 1334, 1343 [47 Cal.Rptr.2d 587].) " '*If a settlor modifies the trust but fails to inform the trustee, the modification [or amendment] will not be effective if the trust instrument requires delivery of the modification [or amendment] to the trustee or the trustee's consent, because the modification [or amendment] will not have been made according to the terms of the governing instrument.*' (Cal. Trust Administration (Cont.Ed.Bar 1985) § 12.3, p. 458, italics added.)" (*Conservatorship of Irvine, supra,* 40 Cal.App.4th 1334, 1343.) In *Irvine,* a trust amendment that was delivered to the wrong individuals was held ineffective. (*Id.* at p. 1346.)

▇▇ Appellants contend that even if the probate court had considered the trust amendment on its merits, it would have had to invalidate the amendment because it was not delivered to the trustee during Winters' lifetime, and that respondent was negligent in not delivering the trust amendment to the trustee in the nine days between the time Winters signed it and the time he died. Respondent, however, maintains that the trust must be read in conjunction with the conservatorship order requiring prior court approval for amendments and that because there was no prior approval here, there was no effective modification to deliver to the trustee. ▇▇ Respondent notes the statement in *Conservatorship of Irvine, supra,* that " '[i]nstruments may require . . . consent of a third party or a specific waiting period before the modification is effective.' " (40 Cal.App.4th at p. 1343, quoting Cal. Trust Administration, *supra,* § 12.3, p. 458.) As *Irvine* noted, " '[p]rovisions like these are designed to protect settlors from possible undue influence of people who would like to benefit from the trust assets.' " (*Irvine,* at p. 1343.)

▇▇ Respondent cannot have it both ways. In arguing on this appeal that the trial court properly found an absence of causation, respondent takes the position that, properly interpreted, the conservatorship order did not require prior court approval of the particular amendment at issue in this case. If that is so, respondent cannot rely on the requirement of prior approval to excuse a failure to deliver the amendment to the trustee.

The trial court made no findings concerning appellants' claim of malpractice based on respondent's failure to deliver the trust amendment to the

trustee before Winters's death; its determination that appellants' damages were not caused by respondent's conduct but by the probate court's erroneous ruling ignores this separate claim. Nonsuit on this basis was therefore inappropriate. It bears noting, however, that in order to prevail on a claim of malpractice based on respondent's failure to deliver the trust amendment to the trustee, appellants will ultimately have to demonstrate both that respondent was negligent in not so delivering the amendment and that the amendment would have been effective if he had done so. This latter showing could be made only if appellants could also demonstrate that the amendment would have been found valid in the context of the prior court approval issue. If a reasonable court would *not* have approved the amendment if respondent had taken what appellants assert were the proper steps to comply with or obtain relief from the conservatorship order's requirement of prior approval, any negligence with respect to delivery of the amendment would be irrelevant.

## II.

Appellants seek sanctions against respondent for his failure to timely file his brief on appeal. Appellant's opening brief was filed on November 28, 2000. On December 12 and 18, respectively, the parties signed a stipulation to extend the time for filing respondent's brief to January 26, 2001, provided that "[n]o Rule 17(b) notice shall be issued extending respondent's time to file his brief beyond January 26, 2001." Apparently, this stipulation was not received by this court. On December 29, this court notified respondent that the matter would be submitted for decision based on the record and appellants' opening brief if respondent's brief was not filed within 15 days, unless respondent showed good cause for an extension of time. (Cal. Rules of Court, rule 17(b) (rule 17(b)).) On January 11, 2001, the stipulation extending time to January 26 was filed.

On January 24, 2001, respondent filed an application for an extension of time to February 16. Respondent's attorney declared that he had determined he needed to file an application to augment the record with documents including the briefs in the appeal from the probate court's order and that he was preparing for an oral argument that had been rescheduled from January 24 to February 21 in an appeal of a $6 million verdict with a record of more than 10 volumes as well as briefing two additional appeals besides the present one. The extension of time was granted on January 25. Respondent's brief was not filed and, on February 21, this court notified respondent pursuant to rule 17(b) that the time for filing his brief had expired.

On March 7, 2001, respondent filed an application for permission to file his brief. According to respondent's counsel, after obtaining the extension to

February 16, 2001, he planned to file the brief "within that time frame and, in any case, within the time frame of a proper Rule 17(b) Notice providing 15 days in which to file the brief, rather than seek another extension, as the brief was substantially completed." Respondent's counsel believed that the December 29, 2000, rule 17(b) notice was erroneous because of the parties' stipulation extending the time for filing the brief until January 26, 2001, and, therefore, that he would receive a rule 17(b) notice with respect to the February 16, 2001, deadline. Instead, respondent's counsel received the February 21 notice that time had expired.

On March 12, 2001, appellants' counsel filed a declaration in opposition to respondent's application, arguing that granting the application would prejudice appellants and that respondent's counsel had no basis to believe he could file his brief later than February 16, 2001. According to appellants' counsel, David W. Baer, when respondent initially asked for the stipulation to extend time in December 2000, Baer explained that a continuance was not in his clients' interests because prejudgment interest was accruing on their claims, which might exceed the policy limits on respondent's professional liability policy, but agreed to the extension "provided that [respondent's counsel] waived his right to a Rule 17(b) extension allowing him to file the respondent's brief after that date." Baer declared that he told Ray Z. Bacerdo to call him if he needed a further extension. On January 24, 2001, Baer received Bacerdo's application for an extension of time to February 16. On February 15, Baer learned that the associate who had prepared the opening brief in this case would be leaving the firm on March 1. She confirmed that she would be able to prepare the reply brief and contacted Bacerdo, who told her he would be filing respondent's brief "at 'the last minute' and might wait for the Rule 17(b) notice." Baer believed the parties' December stipulation precluded any rule 17(b) extensions. Accordingly, he felt it was proper when he did not hear from Bacerdo after receiving the court's February 21 notice that time to file respondent's brief had expired or the court's March 5 notice that the case was fully briefed.

In response to the application to late file respondent's brief, Baer stated that the parties' December 2000 stipulation precluded *any* rule 17(b) extension: He agreed with Bacerdo that the court's December 29, 2000, rule 17(b) notice was sent in error but disagreed that this entitled respondent to a rule 17(b) notice after the February 16, 2001, deadline for filing. Baer stated that it would be "extremely inefficient" to have any attorney other than himself prepare the appellants' reply brief as he was the only one at the firm familiar with the matter, and that he was preparing for a three-week trial in a will contest involving a $3 million estate scheduled for March 26, 2001. Baer stated it would prejudice his clients in the will contest to turn his attention to

drafting the reply brief, while it would prejudice appellants to seek an extension because this would increase "the difference between the policy limits and their damage claim." Baer stated that appellants' claim, including prejudgment interest, exceeded the $1 million limit of respondent's insurance policy, which limit he believed had been reduced by the attorney fees paid by the insurer. Finally, Baer noted Bacerdo's statement in his declaration that respondent's brief was "substantially completed" on January 25, 2001, which Baer felt indicated the brief could have been filed by the February 16 deadline.

On March 21, we granted respondent's request to late file the brief and indicated we would treat appellants' opposition as a request for sanctions and allowed appellants 45 days to file their reply. As permitted by our order, respondent filed a letter brief taking issue with appellants' position. According to respondent, the parties stipulation included a waiver only of the rule 17(b) notice pertaining to the original extension of time to January 26, 2001, and the parties agreed that respondent would be able to seek a further extension to which a rule 17(b) notice would still apply. Bacerdo's letter asserts that when he informed Baer's associate that he would be relying upon a rule 17(b) notice rather than seeking another extension, neither she nor Baer informed him that they disputed his right to do this. With respect to appellants' claims of prejudice, respondent urges that associates leaving firms is a common practice which generally results in the remaining members of the firm carrying additional burdens, and that 45-day period given for filing the reply afforded appellants much more time that the usual 20 days for filing following the respondent's brief. Respondent views the claim of prejudice based on his insurance policy limits "speculative" and "presumptuous" because it assumes appellants will prevail on appeal and assumes the alleged damage claim is a sum certain, and because the delay in question was only two weeks. Appellants, for their part, assert that sanctions are appropriate because of both the lateness of respondent's brief and respondent's counsel's failure to contact appellants' counsel at any time after the December stipulation regarding the further extensions and failures to meet deadlines for filing the brief. According to appellants, prejudgment interest is accruing on their $860,000 claim[3] at a rate of $235.55 per day,[4] so that the 19-day delay in filing respondent's brief corresponds to $4,475.45 in interest. Appellants further assert that but for the delay by respondent, the

---

[3] Appellants' claim is the difference between the total value of Winters's estate and the amount they received in settlement of the appeal from the probate court's ruling. According to appellants' opening brief, the total value of the estate was $1,240,000 and their net recovery from the settlement (after attorney's fees) was about $380,000. According to appellants' counsel's declaration in opposition to respondent's application to late file the brief, the total value of the estate was about $1,260,000 and appellants' net recovery from the settlement was about $390,000.

[4] According to appellants' calculation: $860,000 divided by 365, times 10 percent.

associate who wrote appellants' opening brief would have been able to prepare the reply, which could have been filed by March 8, 2001; appellants therefore attribute to respondent a 59-day delay in disposition of this case due to their reply brief being filed on May 7 rather than March 8, 2001, corresponding to $13,897.45 in prejudgment interest. Finally, appellants estimate that respondent's delay "cost" their counsel $4,000 to $5,000 due to the difference in billing rates for Baer, who actually prepared the reply brief, and the associate who would have prepared it if respondent had filed the brief on or before February 16.

Respondent's conduct in this matter was clearly less than exemplary. The language of the parties' stipulation, providing that "[n]o Rule 17(b) notice shall be issued extending respondent's time to file his brief beyond January 26, 2001[,]" is more susceptible of appellants' interpretation than respondent's. That is, the stipulation appears to contemplate *no* rule 17(b) extensions beyond January 26, 2001, not simply no such extension of that particular date, subject to future rule 17(b) extensions of any subsequent extensions that might be granted. Moreover, having obtained this stipulated extension, which was clearly limited, respondent made no further effort to communicate with appellants' counsel regarding his need for further extensions. Nor did respondent's counsel specifically alert this court, when he sought the extension to February 16, that appellants' counsel had previously expressed concern over further delays.

On the other hand, appellants' claims of prejudice are not very persuasive. With respect to the delay having the effect of requiring Baer to prepare the reply brief personally rather than having it prepared by the associate who prepared the opening brief, respondent is correct that it is a fact of life that associates sometimes leave firms. Appellants offer no evidence that respondent deliberately sought to take advantage of the timing of the associate's leaving; rather, this was an unfortunate coincidence. This court's allowance of 45 days for the filing of the reply brief after respondent's brief was accepted for filing compensated for this consequence of the delay.

Appellants' claim of prejudice based on the accrual of prejudgment interest on their claims is necessarily speculative. First, the claim will only have meaning if in fact appellants ultimately prevail in this malpractice litigation. Second, given the length of time it will take to determine this point—including the time elapsed during the pendency of this appeal, the time for any subsequent trial of the matter and, potentially, any further appeals—the 19-day delay in filing respondent's brief is de minimis. The 59-day delay appellants' seek to attribute to respondent is not appropriately so attributed, both because it is speculative to assume Baer's associate would

have filed a reply brief by March 8 and because appellants' counsel took advantage of the time allowed by this court in not filing the reply brief until May 7. Finally, appellants' claim of prejudice is ultimately based on the assumption respondent will not be able to satisfy a future judgment in appellants' favor if the accrual of prejudgment interest brings the total judgment amount above the limits of respondent's professional liability insurance policy. Appellants present no evidence this is in fact the case.

In sum, while respondent's conduct could have been better, it was not egregious. Appellants were accommodated by the delayed deadline for filing their brief. Sanctions are not warranted.

### Disposition

The judgment is reversed and the matter remanded for proceedings consistent with the views expressed herein. Appellants' request for sanctions is denied. Costs to appellants.

Ruvolo, J., concurred.

**HAERLE, J.**—I concur in everything that my colleagues say, but I would say more. And what I would say implicates a concept apparently overlooked by the court below: the concept of the finality of judgments.

A bit of the procedural history of this case needs to be revisited: in 1996, Judge Carol Yaggy, then a probate court commissioner, entered an order in a conservatorship proceeding requested by the then conservator, the conservatee's wife. It required, as the majority notes, that conservatee Paul J. Winters (recently hospitalized and diagnosed with, among other things, Alzheimer-type dementia) would "not have the power either to amend or revoke [his trust] without the prior approval of this Court." This order was subsequently reapproved and reissued by Judge Yaggy when, upon the death of the wife, a professional conservator was appointed to succeed her as conservator.

As the majority opinion notes, a week or so before the conservatee died in December 1997, an amendment was prepared by respondent, signed by the conservatee and then notarized by respondent, but all without seeking court approval. About a month after Winters's death, in January 1998, respondent sought approval of this amendment from Judge Yaggy, only to be met with opposition from the conservatee's stepdaughter, who would take everything under an unaltered trust.

No one, least of all respondent, should have been surprised when, on April 8, 1998, Judge Yaggy denied the petition, essentially saying that the orders

she had entered twice before meant what they said, i.e., that an amendment to the subject trust had to be approved by the probate court before it could be effective.

Appellants, who stood to be the beneficiaries of the putative amendment, appealed this order to this district (*Conservatorship of Winters,* A082566), but later dismissed their appeal after effecting a settlement with the step-daughter. Thereupon, of course, Judge Yaggy's order of April 8, 1998, became final.

Except, apparently, to respondent and the court below. Evidently encouraged by respondent's counsel via their motions in limine, the court below engaged in what may charitably be called substantial second-guessing of Judge Yaggy's order of April 8, 1998, as well as—albeit implicitly—the two orders underlying it. I regard this exercise and the unmistakable implication of the ruling under review that Judge Yaggy's order was "unreasonable," to be contrary to the spirit, if not the letter, of the concept of judicial finality.[1]

This concept has many subparts, e.g., res judicata, collateral estoppel, the rule prohibiting collateral attacks on judgments, etc. Underlying all of them is the basic principle that: "If a judgment, no matter how erroneous, is within the jurisdiction of the court, it can only be reviewed and corrected by one of the established methods of direct attack." (8 Witkin, Cal. Procedure (4th ed. 1997) Attack on Judgment in Trial Court, § 1, p. 507.) Our appellate courts have repeatedly quoted this basic rule. (See, e.g., *Estate of Buck* (1994) 29 Cal.App.4th 1846, 1854 [35 Cal.Rptr.2d 442]; *People v. $6,500 U.S. Currency* (1989) 215 Cal.App.3d 1542, 1548 [264 Cal.Rptr. 294].)

Now it is technically correct that neither respondent nor the court below specifically sought to "correct" Judge Yaggy's various orders. To that extent, I will concede that what transpired below may not have been, strictly speaking, a collateral attack on those orders. But "review" those orders it certainly did, with many, many explicit references effectively labeling them as "unreasonable." It seems to me that this is fundamentally contrary to both the respect due from one superior court department to another and, more importantly, to the overall concept of the finality of judgments.

---

[1]Nor, contrary to the contention of respondent's counsel at oral argument, is such an exercise mandated or permitted by the "trial within a trial" mechanism discussed in, e.g., *Mattco Forge, Inc. v. Arthur Young & Co.* (1997) 52 Cal.App.4th 820, 831-840 [60 Cal.Rptr.2d 780]. That process may well involve a determination of what, hypothetically, a "reasonable" judge or fact finder *would have done* had the alleged malpractice not have precluded or prevented the necessary finding or determination. It most certainly does not permit, much less mandate, legal malpractice litigation being effectively determined on the premise that an *existing final judgment* is "unreasonable."

And, finally, it was and is also contrary to the principle laid down by this court a decade ago that trial courts ought not to second-guess probate courts on matters within the latter's peculiar jurisdiction. Thus, in *Estate of Gump* (1991) 1 Cal.App.4th 582, 607 [2 Cal.Rptr.2d 269], we said (quoting from an earlier, but by then depublished, opinion in the same controversy): " 'The law disfavors the avoidance of probate proceedings and the litigation on the law side of the court of matters properly heard and resolved in probate.' " This controversy provides an appropriate "amen" to that statement.

A petition for a rehearing was denied September 12, 2001, and the opinion was modified to read as printed above.