Filed 6/4/25  Rodgers-Vieira v. First American Title Co. CA3

NOT TO BE PUBLISHED

California Rules of Court, rule 8.1115(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 8.1115(b).  This opinion has not been certified for publication or ordered published for purposes of rule 8.1115.

IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

THIRD APPELLATE DISTRICT

(San Joaquin)

----

| | |
|---|---|
| ELYSE RODGERS-VIEIRA et al., | C100448 |
| Plaintiffs and Respondents, | (Super. Ct. No. STK-CV-UPN-2018-0012725) |
| v. | |
| FIRST AMERICAN TITLE COMPANY, INC., | |
| Defendant and Appellant. | |

Pursuant to a probate dispute, the probate court required the sale of an 800-acre property co-owned by the plaintiffs and divided into six separate parcels.  Upon the sale of the first parcel (Parcel 1), defendant First American Title Company, Inc. (First American) was hired to handle the escrow and title.  First American created and recorded deeds with an incorrect legal description of the parcel, which created a cloud on title for both Parcel 1 and the adjacent parcels, including, as relevant here, Parcel 4.  Delays in correcting the title issue resulted in a failed sale of Parcel 4 and a subsequent decrease in its ultimate sales price.  Plaintiffs sued First American, alleging a single cause of action

1

for negligence. Following a bench trial, the trial court found in favor of plaintiffs and awarded damages and prejudgment interest.

On appeal, First American challenges the trial court's findings as to causation, damages, the asserted defenses of failure to mitigate and comparative negligence, and prejudgment interest. We modify the award of prejudgment interest and otherwise affirm.

## FACTS AND PROCEEDINGS

*The Property*

Plaintiffs were family members who co-owned an 800-acre property in San Joaquin County (property). The probate court appointed referee Susan Lenz to sell the property. Lenz hired Kevin Dougherty, a real estate broker, to market the property, which was divided into six separate adjoining parcels for sale.

Dougherty hired John Glick, a land surveyor, to assess whether there were any title problems; Glick performed some lot line adjustments in 2016 and created new legal descriptions and boundary lines for each parcel. Glick prepared and recorded documents reflecting the parcels' new legal descriptions.

*The Title Issue*

In September 2016, plaintiffs sold Parcel 1 to a group of buyers. Dougherty hired First American to handle the escrow and title, to include providing the grant deed that included a legal description of the property being transferred. First American prepared a grant deed and deed of trust for Parcel 1, which it recorded at the county recorder's office on September 27, 2016 (2016 deeds). It was undisputed at trial that the 2016 deeds contained an incorrect legal description of Parcel 1, which in turn affected the legal descriptions of the other parcels, including, as relevant here, Parcel 4 (title issue). In February 2017, one of the buyers of Parcel 1 informed Dougherty of the title issue.

*Dougherty's Attempts to Correct The Title Issue*

In February 2017, Dougherty contacted First American and told the escrow manager about the title issue, stating that the issue affected the legal description of the

2

other five parcels and would make it difficult to sell any of the other parcels until the mistake was corrected.[1]  First American told Dougherty it was working to resolve the title issue.

Dougherty was aware that First American had reached out to one of the Parcel 1 buyers because it would need the buyer to sign new documents.  He was not aware of any final documents generated by First American between February and August 2017 that were prepared to resolve the title issue.

*The Lee Purchase Agreement*

On July 28, 2017, potential buyers (the Lees) offered to purchase Parcel 4 for $1.52 million cash.  The offer provided that a $40,000 deposit was due within three business days after acceptance.  Lenz made a counteroffer on August 4, 2017, for $1.6 million, which proposed a 17-day due diligence period commencing upon court approval of the sale, with close of escrow within 45 days of court approval.  The Lees accepted Lenz's counteroffer on August 4; Lenz signed the purchase agreement subject to the counteroffer, and the probate court approved the sale on September 1, 2017.

As relevant here, Paragraph 19 of the purchase agreement provided time periods for the seller (Lenz/plaintiffs) to deliver required disclosures and other information for which they were responsible and for the buyer (the Lees) to remove contingencies and rights of cancellation.  Subsection A of Paragraph 19 provided that the seller had seven days after acceptance of the offer to deliver to the buyer all reports, disclosures, and information for which the seller was responsible under the terms of the purchase agreement, and authorized the buyer to cancel the agreement after first delivering to the seller a notice to perform if the seller had not delivered the identified items within the time specified.  Subsection C of that paragraph provided that the seller had the right to

---

[1]  The trial court noted that First American disputed Dougherty's testimony that he made contact in February 2017, but it found Dougherty's testimony on that point to be credible.

cancel the agreement after first delivering to the buyer a notice to perform if the buyer did not timely deliver to the seller a removal of the applicable contingency or cancellation of the agreement. Paragraph 19 provided that the agreement's terms could be extended, altered, modified, or changed by only mutual written agreement, and removal of contingencies or cancellation under that paragraph by either party could be exercised only in good faith and in writing.

The Lees were engaged in an IRS Code section 1031 like-kind exchange transaction (1031 exchange), where a property owner may defer capital gains taxes on a sale of property provided that the owner identifies a replacement property to purchase within 45 days of the sale and purchases a replacement property within 180 days of the sale of the initial property. (See *McGuire v. More-Gas Investments, LLC* (2013) 220 Cal.App.4th 512, 516, fn. 2.) The Lees were looking to complete this "second leg" (replacement property purchase) of their 1031 exchange. Dougherty testified that due to the statutory time frame for identifying and purchasing a replacement property, "if it doesn't look like things will work in their favor, [1031 exchange buyers will] move on to another property that they know -- that they'll be able to complete a transaction within the specified time frame."

After the purchase agreement was signed, the Lees were unable to make their initial deposit ($40,000 within three days of signing) toward the purchase of Parcel 4 due to the cloud on title caused by the title issue.

*Dougherty Contacted First American*

Dougherty contacted Margo Daoud--who worked in First American's claims department--on August 8, 2017, informing her that he had a pending sale for Parcel 4 that "provides for a close within 45 days," and needed the title issue to be resolved immediately. Daoud subsequently informed Dougherty that the issue was being addressed by an attorney; Dougherty reached out to the attorney but did not receive any response.

4

*Addendum to the Purchase Agreement*

On September 1, 2017, the "first leg" (property sale) of the Lees' 1031 exchange closed, which required them to identify replacement properties by October 16, 2017 (45 days) and purchase the replacement property ("second leg") by February 28, 2018 (180 days).

On September 8, Lenz, on behalf of plaintiffs, and the Lees signed an addendum to the purchase agreement. The addendum indicated that the parties thereto "acknowledge a title issue ('Title Issue') from prior lot line adjustment and sales activity involving the Property ('Prior Activity') is preventing the Title/Escrow Company from opening escrow and thus receiving the Initial Deposit from the Buyer," and that "those involved in the Prior Activity and the Title/Escrow Company are working to resolve the Title Issue." Accordingly, Lenz and the Lees agreed that the purchase agreement "may be extended as follows: [¶] 1. Seller has until October 6, 2017 to resolve the Title Issue. [¶] 2. Upon resolution of the Title Issue, escrow will be opened immediately and the Buyer will deposit the Initial Deposit within 3 business days after escrow opens. [¶] 3. All time periods in Paragraph 19 of the [purchase agreement] shall begin upon the day escrow opens (7 days for Seller reports, disclosures and all other information for which Seller is responsible and 17 days for Buyer investigations and due diligence). [¶] 4. Close of escrow shall occur within 45 days of escrow opening." The addendum clarified, "All other terms and conditions of the Agreement remain."

*September Communications with First American*

On September 8, Dougherty e-mailed Daoud again. He indicated he had not heard back from the attorney working on the issue and reiterated that he was "in the process of losing your court approval purchase sale contract because [First American] is not cooperating in allowing us to complete the signing of the documents to be recorded that will fix the error that [First American] created." Daoud responded that she would ask the

5

attorneys to contact Dougherty, but they did not do so. On September 10, First American retained the Boss Law Firm (Boss Firm) to resolve the title issue.

*The Hayward Property*

On September 19, 2017, the Lees offered to purchase an apartment building in Hayward (Hayward property). They modified and shortened their deadline for waiving contingencies from 17 days to 10, or until October 2. The Lees accepted the sellers' counteroffer on September 21, and they made an initial $45,000 deposit toward the purchase that same day. On October 2, the Lees removed their contingencies. On October 3, the Lees completed their replacement property form for their 1031 exchange, and identified only the Hayward property as the replacement property (although they were not prohibited from identifying multiple properties, had they wanted to). On November 1, escrow closed on the Lees' purchase of the Hayward property.

*First American Resolved the Title Issue*

The Boss Firm drafted the corrective instruments needed to correct the title issue and circulated those documents on September 27, 2017. One of the buyers of Parcel 1, Rajwinder Kaur, delayed in signing the corrective documents. On October 2, Dougherty e-mailed Jim Gwerder, the Lees' realtor, and informed him that the corrective documents were being signed by plaintiffs and the owners of Parcel 1. By October 5, all signatures to the corrective documents were obtained except that of Kaur.

Dougherty testified that he attempted to keep the sale of Parcel 4 to the Lees alive by requesting that the Lees extend the deadline for resolving the title issue, but the Lees did not agree to another extension.

On October 11, Dougherty sent an e-mail to a paralegal at the Boss Firm requesting an update when she had received the last signatures on the corrective documents because "[w]e have pending escrows that are awaiting this information." Dougherty testified that at that point, he "probably was still trying to salvage the Lee

6

deal," although the Lee transaction had effectively expired on October 6, and he was working on another transaction that he "wanted to turn into an escrow."

Kaur provided her signature to the corrective documents on October 11. On October 13, the Boss Firm recorded the corrective deed documents with the San Joaquin County Recorder's Office. No one from First American explained why it took more than six months to get the Boss Firm to resolve the title issue or why First American had not timely resolved the title issue itself.

On November 3, Dougherty's assistant e-mailed Gwerder, stating: "[W]e need to know if the Lee's [*sic*] plan to move forward with the purchase of Parcel '4,' or not. We have not received any new communication/updates from them, to date, nor have they placed their deposit funds into escrow . . . . By Monday, we will need to receive correspondence from you, indicating if the Lee's [*sic*] will be moving forward, if they will be officially cancelling . . . or you can inform us if you have not received any communication from them, whatsoever, so that we can update the Seller, as the Seller needs to keep her process moving forward."

Gwerder responded on November 6: "I have spoken to Mr[.] Lee and the Lees will not be moving forward on the expired contract for the 160 acre Parcel 4." Dougherty's assistant responded to that e-mail with a request for a cancellation document signed by the Lees.

David Boss of the Boss Firm testified that had he known of the October 6, deadline set forth in the addendum for resolving the title issue, he, on behalf of First American, could have "insure[d] through," or insured the transaction despite the existence of the title issue. However, Boss was not aware of any effort to tell plaintiffs or their representatives about the "insure through" option, and he agreed that "only a few . . . in terms of real estate agents and brokers" would know about the "insure through" option.

Plaintiffs agreed to sell Parcel 4 to Kaur in 2018 for $1.2 million. That transaction closed in August 2018.[2]

*Trial Court Proceedings*

Plaintiffs filed a complaint alleging a single cause of action for negligence.[3] Plaintiffs sought general damages in the amount of at least $400,000 and prejudgment interest. The complaint alleged that plaintiffs first learned of the title issue in July 2017, at which time they were in the process of selling two parcels, but the sales could not proceed due to the title issue. The complaint further alleged that due to the loss of those two sales, plaintiffs did not find a buyer for the parcels until June 2018, and they lost approximately $400,000 in profit.

Following a bench trial, the trial court found that plaintiffs were entitled to recover damages in the amount of $400,000 from First American, which was the difference between the proposed $1.6 million price in the Lee purchase agreement for Parcel 4 and its $1.2 million sale price in 2018. First American requested a statement of decision. Plaintiffs then filed a notice of intent to move for a new trial to include prejudgment interest as damages pursuant to Civil Code sections 3287 and 3289. First American filed a supplement to its request for statement of decision. The trial court granted the request for a statement of decision that included plaintiffs' request for prejudgment interest.

*Final Statement of Decision*

The trial court issued its final statement of decision on December 29, 2023. Turning first to the issues of duty and breach, the court found that First American "had a legal duty to use due care in preparing the title documents to transfer the property as the

---

[2] The trial court found in its final statement of decision that the sale to Kaur occurred on April 10, 2018, and closed on August 17, 2018. Dougherty and Ricci testified that the sale of Parcel 4 occurred in August 2018, but the record does not reflect that Kaur agreed to purchase Parcel 4 on April 10, or that the sale closed on August 17.

[3] Certain plaintiffs were subsequently substituted into the litigation via stipulation.

escrow holder in the September 2016 Sale of Parcel 1, which then affected the sale of Parcel 4." It then found that First American "breached its duty of care toward the Plaintiffs by creating and recording the mistaken legal description in the 2016 Deeds."

As to causation, the trial court found First American's breach to be a substantial factor in causing plaintiffs' harm. It found, "[T]he evidence establishes that [First American's] negligence in creating and recording the mistaken legal description in the 2016 Deeds created the series of forces that resulted in the loss of the sale of Parcel 4 to the Lees. [First American's] mistake with Parcel 1 created a cloud on title that interfered with the salability of Parcel 4. Even though Plaintiffs were able to enter into a contract to sell Parcel 4 to the Lees for [$1.6 million] . . . , because Parcel 4 shared a common boundary with Parcel 1, the incorrect legal description in Parcel 1 created a cloud on title for Parcel 4."

The trial court recounted Dougherty's attempts to have First American resolve the title issue, which accelerated after the Lees agreed to purchase Parcel 4. It noted that the Lees were not able to make their initial deposit, and referenced Dougherty's testimony that 1031 exchange buyers, like the Lees, would move on to another property if it did not appear that they would be able to purchase the property.

The trial court found that the purchase agreement expired on its own terms on October 6, when the title issue was not resolved by First American by the deadline set forth in the addendum. The addendum to the purchase agreement provided an October 6 deadline for resolving the title issue, escrow would not open until the title issue was resolved, and the time periods set forth in Paragraph 19 would not begin until escrow opened. Thus, the plain language of the addendum expressly prohibited the sales transaction from moving forward until the title issue was resolved, and provided that plaintiffs had no right to resolve the title issue beyond the October 6 deadline. Accordingly, the purchase agreement failed when the title issue was not resolved by the deadline.

9

The trial court rejected First American's argument that because neither party had canceled the agreement by delivering notice as required by Paragraph 19 of the purchase contract, the purchase contract remained valid and enforceable as of October 13, 2017 (the date the title issue was resolved). The court noted Dougherty's October 11 e-mail, and his assistant's e-mail to Gwerder on November 3, which appeared to suggest Dougherty's understanding that the purchase agreement had not expired, but it credited Dougherty's testimony that those e-mails were attempts to revive the deal, not a reflection of his understanding that the deal remained pending.

The trial court found: "From this chronology, it is apparent that the origin of Plaintiffs' inability to complete the sale was [First American's] mistake in creating and recording the legal description in the 2016 Deeds. This was [First American's] responsibility, and duty to Plaintiffs to create and record the legal description in the 2016 Deeds. Moreover, [First American] compounded the problem by failing to correct its mistake for seven months. [¶] Here, this Court finds that [First American's] negligence in creating and recording the mistaken legal description in the 2016 Deeds was a substantial factor in the loss of the sale of Parcel 4 to the Lees. It was reasonably foreseeable that [First American's] mistake would interfere with the sale of Parcel 4 because [First American's] mistake prevented Plaintiffs from closing any sale until the 2016 Deeds were reformed to correct the mistaken legal description. The 2016 Deeds were not reformed until October 13, 2017, after the October 6, 2017, deadline set by the Addendum had passed. The sale to the Lees expired on October 6, 2017. [¶] The loss of the sale to the Lees is a loss attributable to [First American's] mistaken legal description in the 2016 Deeds. The evidence showed that because of the mistake by [First American] of recording an inaccurate legal description, the Plaintiffs were prevented from transacting any other property sale affected by the mistake until the legal description was cleared up."

10

The trial court rejected First American's arguments that plaintiffs had failed to prove causation. It observed that while First American pointed to the Lees' purchase of the Hayward property as the cause of plaintiffs' harm, the Lees' conduct did not absolve First American's breach of duty, which deprived plaintiffs of the benefits of recording of proper title for the property, including the ability to sell the property. The court noted that First American advanced a narrow view of liability, covering only the final few days before the Lee purchase agreement expired, not the entire seven months during which First American knew of its mistake and failed to correct it, including the three months after the purchase agreement had been executed. The court also declined to draw the speculative inferences proposed by First American.

Next, the trial court found that plaintiffs had established damages. To recover damages, plaintiffs were required to prove the reduction in Parcel 4's value, defined as the difference between its fair market value before and after the harm occurred. (CACI No. 3903F.) The court applied the definition of " 'fair market value,' " found in CACI No. 3903F, as "the highest price for the property that a willing buyer would have paid to a willing seller, assuming: [¶] 1. That there is no pressure on either one to buy or sell; and [¶] 2. That the buyer and seller know all the uses and purposes for which the property is reasonably capable of being used." The court found that the fair market value of Parcel 4 before plaintiffs' harm was $1.6 million "as evidenced by the contract agreed to and signed by the Lees," and the value after plaintiffs' harm to be $1.2 million, based on the subsequent sale of the property. Based on those figures, the court found that plaintiffs had established damages of $400,000. The court further found that plaintiffs acted with reasonable diligence and prudence in marketing and selling Parcel 4 after the sale to the Lees failed, including Dougherty's attempts to revive the sale to the Lees after the expiration of the Lee purchase agreement, and the subsequent sale of Parcel 4 with the approval of Lenz and the probate court.

11

The trial court rejected First American's argument that plaintiffs failed to establish damages because they offered no appraisal or valuation evidence at trial to support the $1.6 million valuation, noting the testimony of defense expert Walter Ricci, who valued the property based on comparable sales at $1.2 million, both in October 2017 and August 2018. It acknowledged Ricci's testimony that he considered the Lees' agreement to purchase Parcel 4 for $1.6 million and found that amount to not be supported by the market, but found that Ricci's valuation "did not adequately address the defined fair market value of the property" or "address the price that the Lees had agreed to pay for Parcel 4."

The trial court also rejected First American's argument that the Lee purchase agreement could not establish the fair market value because the Lees never "went hard" on the agreement by making their initial deposit and releasing their contingencies; it credited Dougherty's testimony that the Lees were prevented from doing so by the cloud on title caused by First American's breach of its duty.

Similarly, the trial court rejected First American's argument that the purchase agreement could not establish damages because it was not an enforceable contract as the Lees had not waived contingencies, finding the argument ignored the fact that the purchase agreement would have been enforceable had First American resolved the title issue by the October 6 deadline.

The trial court then turned to the issue of prejudgment interest, and found plaintiffs were entitled to recover prejudgment interest on the basis that the amount of damages was "certain or capable or being made certain by calculation." (Civ. Code, § 3287, subd. (a).) The court found that plaintiffs' damages were certain as of August 17, 2018, the date they sold Parcel 4 for $400,000 less than what the Lees agreed to pay for it, and First American had notice of the amount sought on the day it was served with the complaint. The court awarded prejudgment interest at a rate of 7 percent per annum from August 17, 2018, until the date of entry of judgment.

12

The court rejected (as duplicative of its argument against damages) First American's argument that prejudgment interest could not be awarded based on the Lee purchase agreement. It also disagreed with First American's arguments based on comparative fault, which we discuss in more detail *post*. Further, the court rejected First American's claim that plaintiffs' request for prejudgment interest was untimely, concluding that the request was made before entry of judgment.

Finally, the trial court turned to First American's affirmative defenses of plaintiffs' failure to mitigate damages, and comparative negligence. First American argued that plaintiffs failed to mitigate their damages by not advising First American, the Boss Firm, or the Parcel 1 buyers of the October 6 deadline to fix the title issue; had they done so, the Boss Firm or First American could have provided a letter of indemnity or insured over the cloud on title, and notification could have caused the Parcel 1 buyers to sign the documents in a timely manner. Noting that mitigation of damages concerns a plaintiff's lack of due care *after* an injury, citing *LeMons v. Regents of University of California* (1978) 21 Cal.3d 869, the court classified this argument as part of First American's comparative negligence claim. The court determined plaintiffs did not act unreasonably in failing to advise First American or the Boss Firm of the October 6 deadline because plaintiffs could not reasonably be expected to be aware of the "insure over" option. First American sought to " 'blame the victim,' " and could not "deflect its own fault by complaining that [plaintiffs] didn't complain enough."

The trial court further found that plaintiffs acted with reasonable diligence and prudence in marketing and selling Parcel 4 after the sale to the Lees fell through by attempting to revive the sale to the Lees and then obtaining a replacement buyer. It addressed First American's claim that the sale to Kaur was not a bona fide arm's length transaction and found that Lenz and the probate court had approved the sale, and defendant's expert had testified that the fair market value of the property was $1.2 million.

The trial court then declined to reduce plaintiffs' damages based on their comparative negligence for essentially the same substantive reasons that it rejected the failure to mitigate claim. The court entered final judgment in favor of plaintiffs on January 22, 2024; the judgment reflected the conclusions of the final statement of decision. The court awarded plaintiffs prejudgment interest at a daily rate of $76.71 from August 17, 2018, until January 22, 2024. Plaintiffs filed notice of entry of judgment on January 26, 2024.

First American filed a timely notice of appeal. The case was fully briefed in December 2024 and was assigned to the current panel at the end of that month.

## DISCUSSION

### I

### *Standard of Review*

We apply settled review standards for a judgment based on a statement of decision following a bench trial. (See *Keading v. Keading* (2021) 60 Cal.App.5th 1115, 1125.) "The statement of decision provides the trial court's reasoning on disputed issues and is our touchstone to determine whether or not the trial court's decision is supported by the facts and the law." (*Slavin v. Borinstein* (1994) 25 Cal.App.4th 713, 718.) We review the trial court's conclusions of law de novo and its findings of fact for substantial evidence. (*McPherson v. EF Intercultural Foundation, Inc.* (2020) 47 Cal.App.5th 243, 257.) Under the deferential substantial evidence standard of review, " 'findings of fact are liberally construed to support the judgment and we consider the evidence in the light most favorable to the prevailing party, drawing all reasonable inferences in support of the findings.' " (*Keading*, at p. 1125.) " 'We may not reweigh the evidence and are bound by the trial court's credibility determinations.' [Citation.] Testimony believed by the trial court 'may be rejected only when it is inherently improbable or incredible, i.e., " 'unbelievable *per se*,' " physically impossible or " 'wholly unacceptable to reasonable minds.' " ' [Citation.] ' "The ultimate determination is whether a *reasonable* trier of fact

14

could have found for the respondent based on the *whole* record." ' " (*McPherson*, at p. 257.) " 'A single witness's testimony may constitute substantial evidence to support a finding.' " (*Ribakoff v. City of Long Beach* (2018) 27 Cal.App.5th 150, 162.) A trial court's findings of fact on causation are reviewed in accordance with the substantial evidence rule. (*Williams v. Wraxall* (1995) 33 Cal.App.4th 120, 132.)

We do not agree with First American that its appellate claims involve the trial court's application of law to undisputed facts, and therefore are subject to de novo review. (See *Boling v. Public Employment Relations Bd.* (2018) 5 Cal.5th 898, 912-913 ["the application of law to undisputed facts ordinarily presents a legal question that is reviewed de novo"].) Whether a defendant was negligent is ordinarily a mixed question of fact and law "and may be determined as a matter of law only if reasonable men following the law can draw but one conclusion from the evidence presented." (*Gray v. Brinkerhoff* (1953) 41 Cal.2d 180, 183; see *Phillips v. TLC Plumbing, Inc.* (2009) 172 Cal.App.4th 1133, 1139 ["causation may be a question of law if on undisputed facts there can be no reasonable difference of opinion on causal nexus"]; *Lombardo v. Huysentruyt* (2001) 91 Cal.App.4th 656, 666 ["Causation is generally a question of fact for the jury, unless reasonable minds could not dispute the absence of causation"]; *Kurinij v. Hanna & Morton* (1997) 55 Cal.App.4th 853, 864 [causation is ordinarily a question of fact unless "under undisputed facts, there is no room for a reasonable difference of opinion"].) Even where the evidence is undisputed, the question remains one of fact for the fact finder " ' "where an honest difference of opinion between men of average intelligence can arise as to the effect of the evidence—that is, if the evidence is such as that different conclusions upon the matter can rationally be drawn from the evidence." ' " (*Hatzakorzian v. Rucker-Fuller Desk. Co.* (1925) 197 Cal. 82, 95.)

Regarding the trial court's interpretation of the addendum, the standard of review turns on whether the parties presented extrinsic evidence to assist in the interpretation and, if so, whether that evidence was in conflict. (*Parsons v. Bristol Development Co.*

15

(1965) 62 Cal.2d 861, 865-866; *Schaefer's Ambulance Service v. County of San Bernardino* (1998) 68 Cal.App.4th 581, 586.) Where, as here, the parties present conflicting extrinsic evidence, the substantial evidence rule is applied. (*Fonstein v. Fonstein* (1976) 17 Cal.3d 738, 746-747; *Roden v. Bergen Brunswig Corp.* (2003) 107 Cal.App.4th 620, 624-625.)

" 'A judgment or order of a lower court is presumed to be correct on appeal, and all intendments and presumptions are indulged in favor of its correctness.' " (*Ribakoff v. City of Long Beach, supra*, 27 Cal.App.5th at p. 162; see *McPherson v. EF Intercultural Foundation, Inc.*, *supra*, 47 Cal.App.5th at p. 257.) Only prejudicial error is grounds for reversal. (*Soule v. General Motors Corp.* (1994) 8 Cal.4th 548, 580.)

II

*Causation*

First American challenges the trial court's finding of causation on three grounds, with the first two overlapping: (1) plaintiffs failed to establish causation because they presented no evidence of the Lees' subjective motivation in failing to purchase Parcel 4; (2) the undisputed evidence supports an inference that the Lees preferred the Hayward property over Parcel 4 and purchased it irrespective of the title issue; and (3) the title issue could not have caused the Lees' failure to purchase Parcel 4 because the purchase agreement did not expire on October 6, 2017, and therefore it was valid and enforceable on the date the title issue was resolved.

As we will explain, the undisputed evidence shows that First American's breach of duty prevented the Lees from making their initial deposit and escrow from opening and caused the Lees and Lenz to enter into the addendum. Further, substantial evidence supports the trial court's finding that the purchase agreement expired on its own terms, precluding finalizing the sale to the Lees. The Lees' subjective motivation for not purchasing Parcel 4, and their ultimate preference for the Hayward property after the title issue surfaced, were not relevant. The issue before us is whether First American's

16

conduct constituted a substantial factor in causing plaintiffs' harm, not the Lees' contribution--if any--thereto.

A. *Legal Background*

" 'The elements of a cause of action for negligence are well established. They are "(a) *a legal duty* to use due care; (b) *a breach* of such legal duty; [and] (c) the breach as the *proximate or legal* cause of the resulting injury." ' " (*Ladd v. County of San Mateo* (1996) 12 Cal.4th 913, 917.) "The proper test for proving causation is the 'substantial factor' test. [Citation.] The 'causation element of negligence is satisfied when the plaintiff establishes (1) that the defendant's breach of duty . . . was a substantial factor in bringing about the plaintiff's harm and (2) that there is no rule of law relieving the defendant of liability.' " (*Mayes v. Bryan* (2006) 139 Cal.App.4th 1075, 1092-1093.)

Under the substantial factor test, "a defendant's conduct is a cause of a plaintiff's injury if: (1) the plaintiff would not have suffered the injury but for the defendant's conduct, or (2) the defendant's conduct was one of multiple causes sufficient to cause the alleged harm." (*Union Pacific Railroad Co. v. Ameron Pole Products LLC* (2019) 43 Cal.App.5th 974, 981; see *Rutherford v. Owens-Illinois, Inc.* (1997) 16 Cal.4th 953, 969 ["The substantial factor standard . . . subsumes the 'but for' test while reaching beyond it to satisfactorily address other situations, such as those involving independent or concurrent causes in fact"]; *Mitchell v. Gonzales* (1991) 54 Cal.3d 1041, 1049 [the "but for" test "should not be used when two 'causes concur to bring about an event and either one of them operating alone could have been sufficient to cause the result [citation]. In those few situations, where there are concurrent [independent] causes, our law provides one cannot escape responsibility for his negligence on the ground that identical harm would have occurred without it. The proper rule for such situations is that the defendant's conduct is a cause of the event because it is a material element and a substantial factor in bringing it about' "].) Our Supreme Court "has suggested that a force which plays only an 'infinitesimal' or 'theoretical' part in bringing about injury,

17

damage, or loss is not a substantial factor." (*Rutherford*, at p. 969.) " 'Conduct can be considered a substantial factor in bringing about harm if it "has created a force or series of forces which are continuous and active operation up to the time of the harm" [citation], or stated another way, "the effects of the actor's negligent conduct actively and continuously operate to bring about harm to another." ' " (*Mayes v. Bryan*, *supra*, 139 Cal.App.4th at p. 1093.)

" 'On the issue of fact of causation, as on other issues essential to the cause of action for negligence, the plaintiff, in general, has the burden of proof. The plaintiff must introduce evidence which affords a reasonable basis for the conclusion that it is more likely than not that the conduct of the defendant was a cause in fact of the result. A mere possibility of such causation is not enough; and when the matter remains one of pure speculation or conjecture, or the probabilities are at best evenly balanced, it becomes the duty of the court to direct a verdict for the defendant.' " (*Ortega v. Kmart Corp.* (2001) 26 Cal.4th 1200, 1205-1206.)

B. *Analysis*

We first note the trial court's unchallenged finding that First American breached its duty of due care in providing the title documents necessary to transfer the property (as the escrow holder in the sale of Parcel 1) by creating and recording the mistaken legal description in the 2016 deeds. The undisputed evidence showed that First American's mistake created a cloud on title that plaintiffs and the Lees understood as preventing plaintiffs from selling Parcel 4 until the title issue was resolved.

As we have described in detail above, because the title issue prevented the transaction from proceeding pursuant to the schedule described in the purchase agreement, Lenz and the Lees agreed to the addendum, which provided in part that the seller had until October 6 to resolve the title issue.

Regarding causation, we first address First American's contention that the addendum did not establish a deadline for resolving the title issue such that the purchase

agreement expired after October 6. First American argues that the addendum does not expressly state that the purchase agreement will expire on October 6 without any further action, and that the addendum did not affect the cancellation provision in Paragraph 19 of the purchase agreement, which it asserts required the Lees to deliver a notice to perform before cancelling the agreement. First American observes that it is undisputed that neither party delivered a notice to perform, and accordingly it argues that the agreement had not been canceled on the date it ultimately resolved the title issue. First American also points to extrinsic evidence: Dougherty's testimony that he could have delivered a notice to perform to the Lees, but did not, and post-October 6 e-mails it asserts demonstrate Dougherty's understanding that the purchase agreement remained valid until after the title issue was resolved.

" ' "The goal of contractual interpretation is to determine and give effect to the mutual intention of the parties. [Citations.]" [Citation.] Thus, "a 'court's paramount consideration . . . is the parties' objective intent when they entered into [the contract].' [Citations.]" [Citation.] "A contract must be so interpreted as to give effect to the mutual intention of the parties as it existed at the time of contracting, so far as the same is ascertainable and lawful." [Citation.] " 'If a contract is capable of two constructions courts are bound to give such an interpretation as will make it lawful, operative, definite, reasonable, and capable of being carried into effect . . . .' [Citations.]" [Citation.]' [Citation.] ' "In sum, courts must give a ' "reasonable and commonsense interpretation" ' of a contract consistent with the parties' apparent intent." ' " (*Brown v. Goldstein* (2019) 34 Cal.App.5th 418, 437-438.)

As we have set forth *ante*, we review the trial court's interpretation of the purchase agreement for substantial evidence. We conclude that the addendum thereto is most naturally read to establish a deadline of October 6 for resolution of the title issue, after which the agreement would expire. The addendum reflects the signing parties' acknowledgement of the title issue, and that First American was working to resolve it.

19

Pursuant to that acknowledgement, Lenz and the Lees agreed that the purchase agreement "*may be extended as follows:* [¶] 1. Seller has until October 6, 2017 to resolve the Title Issue." (Italics added.) While the addendum does not expressly state that the failure to resolve the title issue by October 6 would cause the purchase agreement to lapse, the necessary implication of the parties' agreement that the addendum was extended *until* October 6 is that the agreement was *not* extended *beyond* that date. There is no other reasonable meaning for the deadline established by the addendum.

First American argues that the purchase agreement could not have expired under the terms of the addendum because, under Paragraph 19 of the purchase agreement, the Lees could cancel the agreement only by delivering a notice to perform to the seller. As set forth above, Paragraph 19 provided, "Any removal of contingencies or cancellation *under this paragraph* by either Buyer or Seller must be executed in good faith and in writing," and that the Lees (buyer) "after first Delivering to Seller a Notice to Seller to Perform . . . may cancel this Agreement if Seller has not Delivered" all reports, disclosures, and information for which the seller is responsible. (Italics added.)

First, Paragraph 19 provides only the means by which the parties to the purchase agreement could cancel the agreement under the terms of Paragraph 19; it does not provide that the cancellation provisions set forth therein are the *only* way for the purchase agreement to be terminated. Second, and critically, when considered in context, the cancellation provisions set forth in Paragraph 19 were inoperative until the title issue was resolved. The addendum expressly provides, "All time periods in Paragraph 19 of the [purchase agreement] shall begin *upon the day escrow opens*" (italics added), in other words, after the title issue had been resolved. The cancellation provision set forth in Paragraph 19 authorized the Lees to cancel the purchase agreement after delivering a notice to the seller *if* the seller had failed to timely deliver the reports, disclosures, and information it was responsible for delivering during escrow. Because the addendum suspended those time periods pending resolution of the title issue, the Lees would have

20

no basis for delivering a notice to the seller until the title issue was resolved, the time periods were initiated, and the seller failed to satisfy its obligation to deliver the relevant information to the Lees.

The trial court recognized First American's argument that the purchase agreement was not canceled until November 6, 2017, when Gwerder informed Dougherty that the Lees were not interested in reviving the deal. In support, First American pointed to an October 11 e-mail from Dougherty stating that he had "pending escrows that are awaiting this information," and Dougherty's assistant's November 3 e-mail to Gwerder in which she wrote, "we will need to receive correspondence from you, indicating if the Lees will be moving forward, if they will be officially cancelling." But the court credited Dougherty's testimony that these e-mails were attempts to resuscitate the deal rather than admissions that the purchase agreement remained valid. Further, in response to the November 3 e-mail from Dougherty's assistant, Gwerder responded, "the Lees will not be moving forward on the *expired* contract for the 160 acre Parcel 4." (Italics added.) Gwerder's response demonstrated his understanding that the purchase agreement had expired, and the Lees had no further obligation to perform under the expired agreement. Additionally, plaintiffs evidenced their understanding that the Lee purchase agreement had expired by selling Parcel 4 to Kaur.

Based on the foregoing, substantial evidence supports the trial court's finding that First American's conduct was a substantial factor in causing plaintiffs to lose the sale of Parcel 4 to the Lees. First American created the title issue that prevented the Lees' purchase of Parcel 4 from proceeding under the terms of the purchase agreement and caused Lenz and the Lees to enter into the addendum that established a deadline for the title issue's resolution. When First American failed to resolve the issue by the deadline set forth in the addendum, the purchase agreement expired. First American's conduct was sufficient on its own to have caused plaintiffs' harm.

We next address the remaining two overlapping arguments against causation.

21

First American contends plaintiffs could not establish causation without conclusively proving that the Lees did not purchase Parcel 4 solely because of the title issue. It observes there was no testimony about the Lees' subjective motivation in not purchasing Parcel 4, or their motivation in purchasing the Hayward property instead, and it argues undisputed evidence supports the inference that the Lees simply preferred the Hayward property and purchased it irrespective of the title issue.

As we have concluded, *ante*, the appropriate legal determination is whether First American's conduct constituted a substantial factor in causing plaintiffs' harm. It does not matter if there were *other* substantial factors that *also* caused harm. (See *Union Pacific Railroad Co. v. Ameron Pole Products LLC*, *supra*, 43 Cal.App.5th at p. 981.) In other words, where the evidence establishes that *First American's* conduct in causing the title issue was sufficient to cause plaintiffs' harm, the *Lees'* conduct after the title issue arose, and their possible motivations underlying that conduct, are irrelevant.

First American observes that the Lees offered to buy the Hayward property, shortened their deadline for waiving contingencies, made a $45,000 deposit, removed all contingencies, and identified only the Hayward property on their completed replacement property form for the 1031 exchange, all in the few weeks *prior* to the October 6 deadline to resolve the title issue. But this evidence regarding the timing of the Lees' interest in and commitment to the Hayward property is not sufficient to support an inference that the Lees purchased the Hayward property instead of Parcel 4 *irrespective* of the title issue. (See *Blank v. Coffin* (1942) 20 Cal.2d 457, 461 ["Whether a particular inference can be drawn from certain evidence is a question of law"].) "An inference is a deduction of fact that may logically and reasonably be drawn from another fact or group of facts found or otherwise established in the action." (Evid. Code, § 600, subd. (b).) The proposed inference is speculative and does not logically follow from the evidence on which First American relies. (See *People v. Boatman* (2013) 221 Cal.App.4th 1253, 1265 ["to constitute an inference, the conclusion must to some degree reasonably and logically

follow from the preliminary facts"]; *People v. Babbitt* (1988) 45 Cal.3d 660, 682 [" 'The inference which defendant sought to have drawn from the [proffered evidence] is clearly speculative, and evidence which produces only *speculative* inferences is *irrelevant* evidence' "].) Even assuming the evidence could support an inference that the Lees pivoted to the Hayward property irrespective of the title issue, the same evidence would equally support the inference that the Lees pivoted to the Hayward property *because* of the title issue, which had arisen long before the Lees made any commitment to the Hayward property and had already disrupted the timeline of the sale of Parcel 4. We resolve all reasonable inferences in support of the trial court's decision. (*Keading v. Keading*, *supra*, 60 Cal.App.5th at p. 1125.)

For the same reasons, we reject First American's argument that the rejection of its proposed inference improperly shifts the burden to prove causation. Causation was established by the plaintiffs on the basis that First American created the title issue and failed to correct it for approximately nine months, which prevented the Lee purchase agreement from proceeding on its terms, caused the parties to enter into the addendum and agree to a deadline for resolving the title issue, and ultimately resulted in the purchase agreement expiring after the title issue was not resolved by the deadline set forth in the addendum. There was no burden shifting.

### III

#### *Damages*

First American contends the damages award was speculative because the Lee purchase agreement was unenforceable, and because the court's calculation of damages based on CACI No. 3903F was erroneous.

A. *Contingent Contract Argument*

The trial court found that plaintiffs were entitled to damages in the amount of $400,000. It determined that it was required to decide Parcel 4's fair market value before the harm occurred and subtract from that amount its fair market value immediately after

23

the harm occurred. (CACI No. 3903F.) The court defined the fair market value as "the highest price for the property that a willing buyer would have paid to a willing seller, assuming: [¶] 1. That there is no pressure on either one to buy or sell; and [¶] 2. That the buyer and seller know all the uses and purposes for which the property is reasonably capable of being used. (CACI [No.] 3903F.)" Based on that definition, the court determined the fair market value of the property before plaintiffs' harm was $1.6 million, "as evidenced by the contract agreed to and signed by the Lees."

First American argues that the trial court's damages award was not supported by substantial evidence. It contends that because the Lees did not make their initial deposit or release their contingencies, they remained authorized to cancel the contract at the end of the contingency period, and therefore it was speculative to find that the Lees would have purchased Parcel 4 for $1.6 million had the title issue been resolved.

We disagree. Substantial evidence supports the trial court's implied finding that the benefits of the Lee purchase agreement were reasonably certain to have been realized but for First American's negligent conduct. (See *Piscitelli v. Friedenberg* (2001) 87 Cal.App.4th 953, 989 ["Whatever its measure in a given case, it is fundamental that 'damages which are speculative, remote, imaginary, contingent, or merely possible cannot serve as a legal basis for recovery. [Citations.]' [Citations.] However, recovery is allowed if claimed benefits are reasonably certain to have been realized but for the wrongful act of the opposing party"].)

The Lees agreed to purchase Parcel 4 for $1.6 million in cash, which they had available after the first leg of their 1031 exchange closed on September 1, 2017. While First American focuses on the fact that the Lees did not make their initial deposit, the undisputed evidence showed that the Lees attempted to make their deposit but were *prevented* from doing so due to First American's negligence, which also prevented escrow from opening, and accordingly prevented commencement of the Lees' due diligence period. Had the title issue not prevented the sale from proceeding as agreed by

24

the parties in the purchase agreement, the Lees' due diligence period would have commenced upon court approval of the sale, during which period the Lees would have been obligated under Paragraph 19 of the purchase agreement to conduct their due diligence in good faith. (See also *Bleecher v. Conte* (1981) 29 Cal.3d 345, 350 [" '[I]n every contract there is an implied covenant of good faith and fair dealing that neither party will do anything which injures the right of the other to receive the benefits of the agreement' "].) Dougherty testified that a buyer of real property might seek to renegotiate the agreed-upon price for real property when the buyer "learns of conditions that they were otherwise not made aware of and feel that it has a negative impact on the value," for example, where the buyer learns that improvements to the property need repair. However, Dougherty observed that Parcel 4 was "bare ground," and he had adequately informed the Lees' agent of the condition of the property. Dougherty added that buyers in this situation are not typically "looking for a bargain," but rather are "looking to place a bet on a property that had appreciation potential."

Accordingly, there is little to no relevant evidence in the record that suggests the Lees would not have purchased Parcel 4 at the agreed-upon price had they not been prevented from doing so by First American's negligence. The trial court credited Dougherty's testimony that 1031 exchange buyers will consider another property if it "doesn't look like things will work in their favor." Here, the only "thing" not working out in the Lees' favor with respect to the purchase of Parcel 4 was the title issue.

Based on the foregoing, we disagree with First American's argument that damages could not be awarded based on the Lee purchase agreement.

B. *Calculation of Damages*

First American argues that the trial court's application of CACI No. 3903F was error because that instruction is appropriate only where there have been damages to real property caused by trespass, permanent nuisance, or other tortious conduct. It further contends that no evidence supports the $400,000 damages award because plaintiffs

submitted no evidence of Parcel 4's fair market value; the court relied on valuations of the property from August 2017 and 2018 (rather than immediately before and after October 6, 2017); and the court ignored the testimony of its expert witness, who testified that the fair market value of Parcel 4 was $1.2 million both on October 6, 2017, and in August 2018.

First, tort damages are generally calculated by determining "the amount which will compensate for all the detriment proximately caused thereby, whether it could have been anticipated or not" (Civ. Code, § 3333), and the selection of the measure of damages to apply to a given case is within the trial court's "sound discretion" (*CMSH Co. v. Antelope Development, Inc.* (1990) 223 Cal.App.3d 174, 187). Accordingly, while First American takes issue with the specific jury instruction upon which the court based its determination of damages, the use of the instruction itself is irrelevant. The court had discretion to calculate damages based on the amount that would compensate plaintiffs for the detriment caused by First American's negligent conduct. It determined that this amount was the difference between the amount plaintiffs would have obtained in the absence of First American's negligence and the amount plaintiffs obtained when hampered by First American's negligence. No abuse of discretion appears.

Next, substantial evidence supports the trial court's determination of Parcel 4's fair market value based on the Lee purchase agreement. "Where the measure of damages turns on the value of property, whether liability sounds in contract or in tort, the normal standard is that of market value." (*CMSH Co. v. Antelope Development, Inc.*, *supra*, 223 Cal.App.3d at p. 182.) "The 'fair market value' of real property is 'the best price obtainable from a purchaser on a cash sale.' [Citation.] It 'is measured by the highest price the property would command if offered for sale in the open market with a reasonable time allowed to the seller to find a purchaser who will buy with a knowledge of all the uses to which it may be put.' " (*Ibid.*; see *Forty-Niner Truck Plaza, Inc. v. Union Oil Co.* (1997) 58 Cal.App.4th 1261, 1282-1283 [" 'An actual price, agreed to by a

willing buyer and a willing seller, is the most accurate gauge of the value the market places on a good' "].)  The Lee purchase agreement represented a price obtainable from a purchaser on a cash sale, because the Lees made an offer to purchase Parcel 4 on a cash sale that was accepted by Lenz and approved by the probate court.  We decline to conclude that the Lee purchase agreement could not demonstrate the fair market value on the basis that the sale was never finalized; as we have discussed, the Lees were prevented from purchasing the property due to First American's negligence.

First American argues the trial court erred in basing its fair market value findings on the Lee purchase agreement (entered into in August 2017) and the subsequent sale of Parcel 4 to Kaur (closed in August 2018), rather than determining the fair market value immediately before and after the October 6, 2017, date of plaintiffs' harm.  But regardless of the initial valuation date, the $1.6 million Lee purchase agreement did not expire until October 6, 2017.  For purposes of the trial court's fair market value analysis, the valuation established by the agreement continued until the time of plaintiffs' harm.  As it relates to the court's valuation of Parcel 4 *after* the harm, the court observed that Dougherty diligently sought a buyer after the Lee purchase agreement fell through, but was unable to secure a buyer until later in 2018.  Substantial evidence supports the valuation of the property following the expiration of the Lee purchase agreement.

First American next argues that the trial court ignored the evidence of its appraiser, Walter Ricci, who testified based on sales of comparable property that the value of Parcel 4 was $1.2 million, both in October 2017 and August 2018.  Rather than "ignor[ing]" Ricci's testimony, the court's final statement of decision observed that Ricci had based his valuation of Parcel 4 in October 2017 on comparable sales, and noted Ricci's testimony that he determined the $1.6 million agreement between plaintiffs and the Lees was not supported by the market.  The court found that Ricci's opinion "did not adequately address the defined fair market value of the property," which it had defined as "the highest price for the property that a willing buyer would have paid to a willing seller,

assuming:  [¶]  1.  That there is no pressure on either one to buy or sell; and  [¶]  2.  That the buyer and seller know all the uses and purposes for which the property is reasonably capable of being used.  (CACI [No.] 3903F.)"  Further, the court found that Ricci's opinion had failed to adequately consider the price the Lees had agreed to pay for Parcel 4.  The trial court thus thoroughly considered Ricci's testimony but declined to credit it.  This decision was within the court's discretion.

For the first time in its reply brief, First American argues that plaintiffs failed to present substantial evidence of the valuation of Parcel 4 because the fair market value of property may be shown *only* by the opinions of a witness qualified to express such opinions, or the owner or spouse of the owner of the property.  (Evid. Code, § 813, subd. (a); see *id.*, § 810, subd. (a) ["Except where another rule is provided by statute, this article provides special rules of evidence applicable to any action in which the value of property is to be ascertained"]; *id.*, § 811 [" 'value of property' means market value of . . . [¶] [r]eal property] . . ."].)  Because First American raises this argument for the first time in its reply brief, we do not consider it.  (See *United Grand Corp. v. Malibu Hillbillies, LLC* (2019) 36 Cal.App.5th 142, 158 [" 'We will not ordinarily consider issues raised for the first time in a reply brief' "].)  In any event, First American forfeited this statutory argument by failing to raise it in the trial court.  (*Quiles v. Parent* (2018) 28 Cal.App.5th 1000, 1013 [" 'Failure to raise specific challenges in the trial court forfeits the claim on appeal' "].)  Substantial evidence supports the trial court's findings regarding plaintiffs' damages.

IV

*Affirmative Defenses*

First American contends the trial court erred in finding that it did not establish its affirmative defenses of failure to mitigate or of comparative negligence.  It points to the fact that none of plaintiffs, Dougherty, Lenz, or anyone acting on their behalf informed it or the Boss Firm of the October 6 deadline for resolving the title issue.  It adds that had

28

plaintiffs informed them or the Boss Firm of the deadline, they could have resolved the title issue by having First American insure the transaction.

We reject First American's argument. First, Dougherty notified First American of the title issue in February 2017 and repeatedly urged it to resolve the issue for approximately nine months leading up to the October 6 deadline provided for in the addendum. Thus, First American was aware of the title issue and plaintiffs' continued inability to sell Parcel 4 until the issue had been resolved.

Second, Dougherty notified First American of the pending Lee transaction and the 45-day deadline to close it. Despite being notified of both the title issue and the pending sale, First American failed to address the title issue in a timely manner.

Third, there is no evidence that plaintiffs, Dougherty, or Lenz were or should have been aware of the "insure through" option, and therefore there is no basis upon which to conclude that they should have informed First American or the Boss Firm of the deadline for the purpose of executing that option. In its reply brief, First American asserts that neither First American nor the Boss Firm had any reason to notify plaintiffs of the "insure through" option because plaintiffs did not inform them of the October 6 deadline. But the issue is not whether First American or the Boss Firm had reason to notify plaintiffs of the "insure through" option, but rather whether plaintiffs were negligent for failing to inform First American or the Boss Firm of the deadline. Because plaintiffs had no reason to know about the "insured through" option, they neither failed to mitigate their damages nor were comparatively negligent on the basis that they failed to take steps to take advantage of that option.

V

*Prejudgment Interest*

First American contends the trial court improperly awarded plaintiffs prejudgment interest. We agree with First American in part, and conclude that plaintiffs are entitled to prejudgment interest from October 11, 2018, the date they filed their complaint.

29

Civil Code section 3287, subdivision (a) provides: "A person who is entitled to recover damages *certain, or capable of being made certain by calculation*, and the right to recover which is vested in the person upon a particular day, is entitled also to recover interest thereon from that day, except when the debtor is prevented by law, or by the act of the creditor from paying the debt." (Italics added.)

" ' " 'Damages are deemed certain or capable of being made certain within the provisions of subdivision (a) of [Civil Code] section 3287 where there is essentially no dispute between the parties concerning the basis of computation of damages if any are recoverable but where their dispute centers on the issue of liability giving rise to damage.' [Citations.]" [Citation.] Thus, " ' "[t]he test for recovery of prejudgment interest under [Civil Code] section 3287, subdivision (a) is whether *defendant* actually know[s] the amount owed or from reasonably available information could the defendant have computed that amount. [Citation.]" [Citations.] "The statute . . . does not authorize prejudgment interest where the amount of damage, as opposed to the determination of liability, 'depends upon a judicial determination based upon conflicting evidence and it is not ascertainable from truthful data supplied by the claimant to his debtor.' [Citations.]" [Citation.] Thus, *where the amount of damages cannot be resolved except by verdict or judgment, prejudgment interest is not appropriate*.' " ' " (*Warren v. Kia Motors America, Inc.* (2018) 30 Cal.App.5th 24, 44.) " 'If the defendant does not know or cannot readily compute the damages, the plaintiff must supply him with a statement and supporting data so that defendant can ascertain the damages.' " (*KGM Harvesting Co. v. Fresh Network* (1995) 36 Cal.App.4th 376, 391.)

"[T]he policy underlying the requirement for prejudgment interest where the damages are deemed 'certain' or 'capable of being made certain . . .' (Civ. Code, § 3287) is that in situations where the defendant could have timely paid that amount and has thus deprived the plaintiff of the economic benefit of those funds, the defendant should therefore compensate with appropriate interest." (*Wisper Corp. v. California Commerce*

30

*Bank* (1996) 49 Cal.App.4th 948, 962 (*Wisper Corp.*).) Courts have given a "generally liberal construction of 'certainty' under [Civ. Code] section 3287." (*Chesapeake Industries, Inc. v. Togova Enterprises, Inc.* (1983) 149 Cal.App.3d 901, 907.)

"Where the facts are not in dispute or, alternatively, have been established by findings of the trial court supported by substantial evidence, appellate courts independently review whether and when the plaintiff's damages were made certain or capable of being made certain by calculation." (*Watson Bowman Acme Corp. v. RGW Construction, Inc.* (2016) 2 Cal.App.5th 279, 296.)

First American argues that prejudgment interest was improperly awarded because it disputed the amount of damages, not merely liability. But while it argues that it "vehemently disputed there were *any* damages based on uncontradicted expert testimony regarding the fair market value of Parcel 4" (italics added), the argument that plaintiffs suffered no damages is an argument regarding liability. "A claim that damages [are] $0 is not a dispute which renders the amount of damages uncertain; it is effectively an argument for no liability. A defendant's denial of liability does not make damages uncertain for purposes of Civil Code section 3287." (*Los Angeles Unified School District v. Torres Construction Corp.* (2020) 57 Cal.App.5th 480, 508, fn. omitted.)

First American also argues that the amount of damages was disputed because it asserted a comparative negligence defense. It is generally true that prejudgment interest is not authorized in cases involving comparative negligence because damages are not subject to calculation until after trial. (See *Wisper Corp.*, *supra*, 49 Cal.App.4th at p. 961.) But where, as here, plaintiffs were not found to be negligent, such that there is no significant disparity between the damages plaintiff sought and the damages ultimately awarded, the mere claim of comparative negligence does not preclude the award of prejudgment interest. (*Id.* at p. 962.) Prejudgment interest is not precluded on the basis that First American raised a comparative negligence defense.

First American also argues that prejudgment interest was not properly awarded from August 17, 2018, because there is no evidence that it knew or could have known based on reasonably available information that plaintiffs were claiming $400,000 in damages on that date. We agree. The trial court found that damages were made certain on August 17, 2018, although it did not explain its basis for finding that First American knew or could have reasonably calculated the amount of damages on August 17; rather, it noted only that plaintiffs' complaint was filed on October 11, 2018. Plaintiffs argue that First American was aware that they sought $400,000 in general damages "at the outset of this action," although they assert only that they served their complaint on First American in 2018.

For purposes of Civil Code section 3287, courts "focus on the *defendant's* knowledge about the amount of the plaintiff's claim. The fact that the plaintiff or some omniscient third party knew or could calculate the amount is not sufficient. The test . . . is: *did the defendant actually know the amount owed or from reasonably available information could the defendant have computed that amount.* Only if one of those two conditions is met should the court award prejudgment interest [under Civil Code section 3287, subdivision (a)]." (*Chesapeake Industries, Inc. v. Togova Enterprises, Inc.*, *supra*, 149 Cal.App.3d at p. 907, first italics original, second italics added.) Here, neither the trial court nor plaintiffs point to any evidence that First American knew or reasonably could have calculated the amount of damages based on information reasonably available to it from August 17, 2018. Instead, based on the record before us, the earliest date First American could have known the amount of damages claimed by plaintiffs was October 11, 2018, the date plaintiffs filed their complaint. (See *KGM Harvesting Co. v. Fresh Network*, *supra*, 36 Cal.App.4th at p. 392, fn. 9 [prejudgment interest awarded from the date information from which to calculate damages was provided to defendant].)

First American further argues that damages were uncertain even on the date the complaint was filed because the complaint was not sufficiently specific about the nature

of the damages sought. The complaint alleged that plaintiffs "were forced to sell two parcels of real property adversely affected at a loss" and that they had suffered damages "in an amount not less than $400,000, plus costs Plaintiffs incurred, for among other things, to pay professionals to correct the legal descriptions." The complaint added that plaintiffs had further been damaged "in an amount according to proof at trial," and they sought damages "of at least $400,000." But while the language used in the complaint did not precisely state that the entirety of the damages sought was based on the loss of the sale of Parcel 4 to the Lees and the subsequent sale of that parcel to Kaur, the complaint was sufficiently definite to inform First American of the amount of damages sought and the basis therefor. First American does not dispute that it was aware of the conduct that resulted in the title issue, or that it was aware of the parcels at issue in the complaint. Further, "where there is no significant disparity between the amount claimed in the complaint and the final judgment, this factor generally tends to show that damages were certain or capable of calculation." (*Wisper Corp.*, *supra*, 49 Cal.App.4th at p. 961.)

From the date of filing the action, October 11, 2018, to the date judgment was entered, January 22, 2024, is 1,930 days. The daily interest earning is calculated by multiplying the amount of the judgment ($400,000) by the applicable annual interest rate (7 percent), and dividing that product by 365 days. Here the daily interest earning is $76.71. Multiplying that figure by 1,930, we calculate the total interest accrued to be $148,054.79.

## DISPOSITION

The judgment is modified to award plaintiffs prejudgment interest in the amount of $148,054.79.  In all other respects, the judgment is affirmed.  Plaintiffs shall recover their costs on appeal.  (Cal. Rules of Court, rule 8.278(a)(3).)


_____/s/_____
Duarte, J.


We concur:


_____/s/_____
Earl, P. J.


_____/s/_____
Renner, J.